**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ERIC ANDRÉ and CLAYTON ENGLISH,<br><br>             Plaintiffs,<br><br>   v.<br><br>CLAYTON COUNTY, GEORGIA; KEVIN ROBERTS, in his official capacity as Chief of the Clayton County Police Department; AIMEE BRANHAM, individually and in her official capacity as a police officer of the Clayton County Police Department; MICHAEL HOOKS, individually and in his official capacity as an investigator of the Clayton County District Attorney; TONY GRIFFIN, individually and in his official capacity as a police officer of the Clayton County Police Department; KAYIN CAMPBELL, individually and in his official capacity as a police officer of the Clayton County Police Department; and C. SMITH, individually and in his official capacity as a police sergeant of the Clayton County Police Department.<br><br>             Defendants. | Civil Action No. _____ |

## **COMPLAINT**

Plaintiffs allege as follows:

## INTRODUCTION

1.

This case concerns the Clayton County Police Department's ("CCPD") operation of an "interdiction" program at Atlanta's Hartsfield-Jackson International Airport ("Atlanta Airport") that, through racial profiling and coercive stops and searches, has violated the constitutional rights of scores of people, disproportionately Black people.

2.

The program consists of armed CCPD officers and Clayton County District Attorney's Office ("CCDAO") investigators waiting in jet bridges—the narrow tunnels that connect airplanes to airport gates—to selectively intercept passengers, take their boarding passes and identifications, interrogate them before they board their flights, and search their carry-on luggage, all in the name of combatting drug trafficking (the "jet bridge interdiction program") . CCPD calls these stops "consensual encounters" and "random." They are neither; the CCPD jet bridge interdictions rely on coercion, and targets are selected disproportionately based on their race.

3.

Few if any airline passengers in the post-9/11 world, focused on boarding their

flight and stuck in a narrow jet bridge, would feel at liberty to walk away from armed law enforcement officers who unexpectedly intercept their path, question them, and take their boarding pass and identification.

4.

A program designed to subject passengers to stops and searches under these circumstances must withstand Fourth Amendment scrutiny. The CCPD jet bridge interdiction program cannot. Its stops and searches are coercive, not consensual. Its target selections are unsupported by any legitimate cause or suspicion. There are no written policies or procedures governing the jet bridge program. Nor are there any written memoranda memorializing the partnerships into which CCPD has entered for its execution, such as with the CCDAO.

5.

Nor can the program survive scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Although CCPD officers reportedly tell stopped passengers that they have been chosen at "random," CCPD's own records make clear that the officers conducting the jet bridge interdiction program select their targets based on race. From September 2020 through April 2021—a period that captures the stops of Plaintiffs Eric André and Clayton English—CCPD conducted 378 passenger interdictions in jet bridges where department records list the race of the passenger

stopped. Of those, 56% of stopped passengers were Black. Given that only 8% of American airline passengers are Black (and given that the Atlanta Airport fairly represents that population), the probability of this happening randomly is staggering: significantly less than one in one hundred trillion.

6.

There is no legally-acceptable justification for CCPD's racial profiling. The purported justification for the jet bridge interdiction program is to confiscate drugs and drug-related cash proceeds. But this justification for the program does not even withstand cursory scrutiny, let alone provide a legal basis for racial profiling.

7.

With regard to drugs, CCPD records show that, over an eight-month span that captures the period at issue in this complaint, CCPD officers conducting jet bridge stops found fewer than 0.08 pounds (36 grams) of illegal drugs, plus 6 prescription pills with no valid prescription, and CCPD only brought charges against two passengers.

8.

As for the currency seized in this same time frame by officers implementing the jet bridge interdiction program—totaling over $1,000,000—all but one of the passengers from whom CCPD seized money were allowed to continue on their

travels. These seizures do not meaningfully combat drug trafficking, but they do provide a financial windfall for the department by taking advantage of the permissive civil standards for asset forfeitures and the reluctance of individuals (particularly individuals of color) to challenge seizures.

9.

Mr. André and Mr. English are both Black men who, months apart, were unconstitutionally singled out because of their race and detained by CCPD and CCDAO officers, while attempting to board their flights from Atlanta to Los Angeles. Neither man committed any crime nor engaged in any suspicious activity.

10.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the harms caused to them by the individual officers' actions and by CCPD's policy and practice of unconstitutionally detaining passengers in airport jet bridges, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## **PARTIES**

*Plaintiffs*

11.

**Plaintiff Eric André** is a Black, internationally-celebrated stand-up

comedian, actor, and writer. He currently resides in Los Angeles, California.

12.

**Plaintiff Clayton English** is a Black, internationally-celebrated stand-up comedian, actor, and writer. He currently resides in Atlanta, Georgia.

*Defendants*

13.

**Defendant Clayton County, Georgia,** is a governmental agency and political subdivision of the State of Georgia. The Clayton County Police Department (CCPD) is an agency of Clayton County.

14.

**Defendant Kevin Roberts** is the Chief of CCPD. He is the agency's principal executive officer and has ultimate responsibility for setting the policies and practices of CCPD and ensuring that the agency's programs, policies, and practices comply with federal and state law. He is sued in his official capacity.

15.

**Defendant Aimee Branham,** at all times relevant to this Complaint, was a police officer with CCPD. At all times relevant to this Complaint, she acted within the scope of her employment and under color of state law. She is sued in her official and individual capacities.

16.

**Defendant Michael Hooks**, at all times relevant to this Complaint, was an investigator with the CCDAO. At all times relevant to this Complaint, he acted within the scope of his employment and under color of state law. He is sued in his official and individual capacities.

17.

**Defendant Tony Griffin** at all times relevant to this Complaint, was a police officer with CCPD. At all times relevant to this Complaint, he acted within the scope of his employment and under color of state law. He is sued in his official and individual capacities.

18.

**Defendant Kayin Campbell,** at all times relevant to this Complaint, was a police officer with CCPD. At all times relevant to this Complaint, he acted within the scope of his employment and under color of state law. He is sued in his official and individual capacities.

19.

**Defendant C. Smith**, at all times relevant to this Complaint, was a police sergeant with CCPD, with supervisory responsibilities. At all times relevant to this Complaint, he acted within the scope of his employment and under color of state

law. He is sued in his official and individual capacities.

## JURISDICTION AND VENUE

### 20.

This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the Fourth and Fourteenth Amendments to the U.S. Constitution and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### 21.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law and is brought to redress a deprivation of civil rights.

### 22.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted herein occurred within the Northern District of Georgia.

## FACTUAL ALLEGATIONS

**A. The Plaintiffs' Experiences Being Profiled and Unconstitutionally Targeted by CCPD.**

*Experience of Clayton English*

23.

On October 30, 2020, Mr. English was flying from Atlanta, GA, to Los Angeles, CA, for work.

24.

After Mr. English arrived at the Atlanta Airport, he waited in line to go through Transportation Security Administration (TSA) screening. An array of signs (a) instructed passengers that they and their luggage were subject to search, (b) warned that TSA K9 teams were in use in the airport, and (c) cautioned that no liquids over 3 ounces would be allowed through security. Loudspeaker announcements further warned passengers that unattended bags would be removed by security and might be destroyed. *See also infra* ¶ 65 (describing the airport security environment post-9/11).

25.

At the TSA security screening station, signs instructed passengers to remove shoes and large electronic devices from bags for x-ray screening, discard prohibited liquids, and place bags and other belongings on a conveyor belt for inspection. Uniformed officers signaled passengers into a millimeter wave scanner, where passengers were directed to raise their arms and remain still as the device scanned their entire bodies. Passengers waited for officers to tell them they were free to exit

the scanner, and then free to move on to wait for their bags to emerge from the x-ray inspection and collect them.

26.

Mr. English understood at every step of the way that he was not free to move forward, leave the security area, or reclaim his luggage until an officer affirmatively told him he could do so.

27.

Mr. English understood that if an officer asked him to submit to a pat down, dog sniff, or handheld screening wand following the full body scan, he would have had to comply. He also understood that if he was selected to have his hands swabbed for chemical traces of explosive devices, he would have had to comply. And he understood that if an officer decided to subject his belongings to a manual search, he would have had to comply.

28.

Mr. English understood that if he did not comply with the officers' orders, he would not be allowed to board his flight and likely would be subject to further detention and/or arrest.

29.

Mr. English believed that every passenger attempting to fly that day would be

subject to these protocols and that he would not be singled out for further detention or search unless a randomized program automatically selected him for secondary screening or an officer had reasonable suspicion that a further detention or additional search was necessary. In other words, he understood that the process of securing the airport and identifying contraband was regularized, and that it prohibited official arbitrariness or discrimination.

30.

After clearing security, Mr. English arrived at the Delta gate for his flight to Los Angeles. The area where he waited to board had secured gates, doors, and elevators, all with restricted access. When he was told he could board, Mr. English handed his ticket to the Delta agent, who scanned it, handed it back, and allowed him to proceed onto the jet bridge. He understood that if he attempted to walk onto the jet bridge and board the plane without the gate agent's permission, the agent could call for law enforcement to detain him.

31.

After Mr. English had advanced a few steps into the narrow jet bridge, with passengers in front of and behind him, two CCPD officers emerged from a bend in the tunnel and cut off his path. Mr. English subsequently learned from an Open Records Act ("ORA") request that these officers were Defendants Griffin and

Campbell.

32.

The officers wore plain clothes with badges around their necks.

33.

The officers flashed their badges and began peppering Mr. English with questions about whether he was carrying any illegal drugs. Mr. English was alarmed and caught off guard. He stated that he was not carrying any illegal drugs. The officers began rattling off a litany of potential illegal substances he might be carrying, such as cocaine, methamphetamine, unprescribed pills, and others. Mr. English continued to repeat that he did not have any illegal drugs.

34.

Mr. English understood that he was not free to leave and continue his travel while the officers were questioning him.

35.

After a period of these questions, the officers instructed Mr. English to step to the side of the jet bridge. Mr. English complied. He understood that he did not have any choice but to comply.

36.

After moving him to the side of the jet bridge, one officer stood on Mr. English's left while the other stood on his right, effectively blocking his path onto the plane.

37.

One officer asked Mr. English to hand over his ID and boarding pass. Mr. English complied. He understood that he did not have any choice.

38.

While holding his ID and boarding pass, the officers continued to ask Mr. English if he was carrying illegal drugs and began to ask questions about his profession, his reason for traveling to Los Angeles, and how long he planned to stay.

39.

Throughout the interrogation, Mr. English's fellow passengers continued to board the plane. As they squeezed and maneuvered around Mr. English and the officers, many of the passengers openly gawked at the interaction.

40.

Mr. English did not understand why he was being singled out for this invasive and humiliating experience, or why the officers seemed so concerned that he might possess illegal drugs.

41.

After additional questioning, during which the officers continued to retain Mr. English's ID and boarding pass, one officer stated that he wanted to search Mr. English's carry-on luggage. Believing he had no choice, Mr. English acquiesced.

42.

One officer immediately began rummaging through Mr. English's luggage, while the other continued to question him.

43.

Only after the officers began searching Mr. English's luggage did they return his ID and boarding pass.

44.

Still unsure about why the officers were searching his bag, Mr. English asked: "What exactly is going on here?" The officers did not answer, returned his luggage, and told him that he was free to leave. Mr. English boarded his flight.

45.

Throughout the encounter, Mr. English was worried that if he said anything the officers perceived as "out of line," he would not be allowed to board the plane or reach his destination.

46.

After boarding the plane, Mr. English spent the entire flight ruminating over the encounter, convinced that something else was going to happen. The entire experience was degrading and disturbing.

*Experience of Eric André*

47.

On April 21, 2021, Plaintiff Eric André finished a television shoot in Charleston, SC, and boarded a Delta flight to Atlanta, where, after a short layover, he would board a connecting flight home to Los Angeles, CA.

48.

Like Mr. English, and all commercial airline passengers, Mr. André began his trip at the Charleston airport walking past signs and listening to repeated announcements informing prospective passengers that they and their belongings were subject to search. He handed his ticket and ID to a law enforcement officer, submitted his bag to x-rays, and walked through a metal detector, all the while aware that he might be subject to a mandatory pat down or additional luggage search if deemed necessary by an officer. Like Mr. English, and all commercial airline passengers, Mr. André understood that he would not be allowed to board his flight, and risked detention and possibly arrest, if he declined to comply with an officer's

-15-

instructions.

49.

After spending the majority of his Atlanta layover in the Delta lounge, Mr. André walked to his Delta gate for his connecting flight.

50.

Mr. André was traveling in the Business Class cabin. When the Delta gate agent invited Business Class passengers to board, Mr. André joined the priority boarding line. About a dozen other passengers lined up to board through the priority line. Mr. André did not see any other Black passengers boarding with this group.

51.

A Delta agent scanned Mr. André's ticket and allowed him to enter the jet bridge. After Mr. André had advanced a little way down the jet bridge tunnel, a CCPD officer and CCDAO investigator, wearing plain clothes and badges around their necks, obstructed his path. Mr. André learned through subsequent open records requests that these officers were Defendants Branham and Hooks. According to CCPD's records, another CCPD officer, Defendant Campbell, was present at a different location in the jet bridge.

52.

The two officers flashed their badges and mumbled a few words that Mr. André, who was alarmed and caught off guard, was unable to hear or understand.

53.

Before Mr. André could respond to the officers' sudden appearance, they began challenging him with a series of questions. They asked Mr. André whether he was carrying any illegal drugs, and then more specifically and in quick succession, whether he was carrying cocaine, methamphetamine, prescription drugs that were not prescribed to him by a doctor, or other narcotics.

54.

In response to their repeated questioning, Mr. André consistently denied having any illegal drugs. He understood that he did not have any choice but to continue to reply to the officers' questions, and that he was not free to leave the officers during the questioning.

55.

The agents asked Mr. André to hand over his ticket and government ID, and he complied. He did not believe he could say no. The agents recorded the information contained on Mr. André's ID, including his full name, address, ID number, and date of birth. The agents continued to ask Mr. André questions

throughout this process, including about his travel plans and his reason for flying.

56.

One of the officers volunteered to Mr. André that they were conducting "random" stops inside the airport. The officer also told Mr. André that the questions were "protocol."

57.

Throughout the encounter, passengers continued to board the plane. Because the jet bridge was so narrow, the passengers had to squeeze around Mr. André and the officers. Many stopped to gawk at the scene.

58.

After approximately five minutes of standing in the narrow jet bridge and being questioned, Mr. André was told by the officers that he was free to leave and board the plane.

59.

The experience was traumatizing, degrading, and humiliating.

**B. Officers Subjected Plaintiffs to these Unconstitutional Stops and Interrogations as Part of an Official CCPD Program.**

60.

Mr. English and Mr. André's experiences were not isolated incidents. These

two nearly identical detentions, conducted nearly six months apart, were part of a longstanding, formal CCPD program.

61.

CCPD operates a "specialized" "Airport Interdiction Unit" ["the Unit"]—also known as the "Clayton County Narcotics Unit-Airport Investigations Group"—out of the Atlanta Airport.

62.

As part of the Unit's regular operations, CCPD officers, sometimes in the company of CCDAO investigators, wait in the jet bridge of departing domestic flights and conduct what they claim are "random," "consensual" encounters with passengers attempting to board their flights.

63.

In reality, these encounters are neither random nor consensual.

64.

When conducting these jet bridge interdictions, armed CCPD officers and CCDAO investigators wait in the jet bridge, select passengers to target for interrogation, step into their target passengers' pathways, flash their badges, inspect the passengers' tickets and IDs, record identifying information from the IDs in a log, question the passengers about whether they are carrying illegal drugs or large

amounts of currency, and seek to search the passengers' luggage.

## C. The Jet Bridge Interdiction Program Utilizes Coercive Detentions, Interrogations, Seizures, and Searches Under the Pretext of "Consensual Encounters."

65.

Since 9/11, airline passengers have come to understand that airports operate with multiple layers of strict security, and that there are significant consequences for non-compliance. *See, e.g.,* Maureen O'Hare, "How 9/11 Changed Travel Forever," CNN (Sept. 5, 2021), *available at* https://edition.cnn.com/travel/article/air-travel-after-9-11/index.html (describing the comprehensive changes to the airport security environment after 9/11). All commercial passengers traveling through the United States know they must hand over their government-issued ID and ticket upon request at various checkpoints; remove their jackets, shoes, and belts, and empty their pockets before going through security; pass through a full-body scanner (or metal detector if they have applied for and received a TSA PreCheck security clearance); have their belongings x-rayed; and accept that TSA will detect and remove liquids over 3 ounces, or other prohibited items, from their carry-on luggage. Passengers also know that they may be subject to a physical pat down, a dog sniff, a manual search through their belongings, a search using a magnetometer (or "wand"), and a swab of their hands to test for chemical traces of explosive devices.

66.

All of these procedures are overseen by law enforcement officers whose orders all airport travelers are bound to follow. Even perceived failure to comply can result in detention or arrest. *See United States v. Aukai*, 497 F.3d 955, 957 (9th Cir. 2007) (describing how changes in airport security post-9/11 have changed concepts of consent in airport searches). Once a passenger seeks to enter the secured section of the airport, he or she cannot refuse consent, or revoke consent, to this intensive screening process. *Id.* at 960 (noting that prior to 9/11, a "passenger could refuse to be searched at the airport if he stated he had changed his mind and no longer wished to fly," but "requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world").

67.

It is well-documented that people of color are disproportionately profiled and targeted by airport security—as confirmed by Congressional hearings and government investigations. *See Hearing on Perspectives on TSA's Policies to Prevent Unlawful Profiling Before the Comm. on Homeland Security*, No. 116-24, 116th Cong. (2019) ("TSA Congressional Hearing"); U.S. Gov't Accountability Office, Report No. GAO-19-490T, *Aviation Security: TSA Has Policies that Prohibit Unlawful Profiling but Should Improve its Oversight of Behavior Detection*

*Activities* (2019) ("GAO Report"). As the Government Accountability Office found in 2019, after investigating years of complaints of discrimination in TSA security procedures, those procedures manifest "indications of potential discrimination and unprofessional conduct that involved race or other factors." GAO Report Summary, https://www.gao.gov/products/gao-19-268; *see also* TSA Congressional Hearing, Comments of Chairman of the House Homeland Security Committee, Representative Bennie G. Thompson ("[F]or more than a decade regarding TSA's behavior detection program and the door it opens to unlawful profiling, it is unconscionable that TSA has not developed better oversight procedures.").

68.

More specifically, law enforcement officials have long been on notice that the airport drug interdiction and cash seizure activity at issue in this case—involving suspicionless stops of passengers—"raise[s] civil rights concerns," and is "more often associated with racial profiling than law enforcement contacts based on previously acquired information." U.S. Gov't Office of the Inspector General, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities* (2015), at 1-3. The Department of Justice "has long been concerned about the potential for profiling to occur in connection with" these stops of passengers. *Id.* at 11.

69.

Aware of the already profoundly coercive nature of law enforcement encounters in the airport generally, CCPD officers and CCDAO investigators specifically choose a uniquely coercive moment, manner, and location to stop passengers. Under the jet bridge interdiction program, armed officers accost passengers in narrow, highly-restricted jet bridges, flashing their badges at passengers attempting to board their flights, catching them off guard and blocking their paths while other passengers squeeze around them. The officers hold the passengers' identifications and tickets while bombarding them with questions. Officers are required, as part of the program protocol, to "request" to search the bags of every individual they detain. They conduct those searches in view and earshot of other passengers in the jet bridge.

70.

The allegations in this paragraph are upon information and belief. Defendant Smith was one of the CCPD supervisory officers who was on notice of the practice of stopping, seizing, and searching passengers in jet bridges. Sgt. Smith failed to act to constrain the discretion of individual officers. Sgt. Smith knew or should have known that subordinate officers were acting unlawfully, and failed to stop them from doing so. Instead, Sgt. Smith's actions furthered CCPD's customs and policies that

manifested deliberate indifference to Plaintiffs' constitutional right to be free from unlawful searches and seizures.

71.

Reasonable individuals interdicted by CCPD officers in jet bridges would not and do not believe they are free to decline the officers' requests, or to ignore and navigate around the officers absent affirmative permission.

72.

Not only has the need to submit to law enforcement requests been ingrained in air passengers since 9/11—as described above—but reasonable passengers are especially unlikely to feel that they may resist officers' demands in the cramped, highly-secure jet bridge. By ambushing passengers in this manner, the Unit's officers compound the enormous, preexisting compulsion to cooperate with airport law enforcement by exploiting the passengers' fear that they will create an untoward scene or will appear guilty, subversive, or dangerous to their fellow passengers. By design, all of these factors exert tremendous coercive pressure on an individual passenger in the jet bridge to acquiesce to the officers' wishes. Those pressures are even greater for persons of color, given the history of racial profiling by airport security officers.

73.

For the same reasons, most people in this situation would not believe that they could decline a law enforcement officer's request to search their bag(s).

74.

Despite being on notice of the inherently coercive nature of law enforcement encounters in the airport generally, the profoundly coercive nature of jet bridge detentions and searches in particular, and the susceptibility of drug interdiction and cash seizure programs to arbitrary and selective enforcement, CCPD does not have any written formal or informal policies or practices that even purport to constrain the discretion of the officers when conducting the jet bridge interdiction program.

75.

Likewise, despite CCPD records stating that the Unit "work[s] in cooperation and coordination with the staff [*sic*] the various airlines as well as various local, state, and federal agencies stationed at the airport," CCPD has conceded in response to an open records request that it does not have any formal or informal memoranda memorializing the policies and expectations governing these collaborations.

**D. The Jet Bridge Interdiction Program Disproportionately and Purposefully Targets Black Passengers.**

76.

The jet bridge interdiction program purposefully discriminates against Black

passengers, and against passengers of color more generally.

77.

For 378 of the 402 documented jet bridge stops during the relevant period, CCPD records list the race of the passenger. Of these 378 passengers, 211—or 56%—were Black, and 258—or 68%—were people of color. But only 8% of American air travelers are Black (compared to 13.6% of the American population generally), and only 33% are people of color. White (non-Hispanic) passengers comprise 67% of American airline travelers. John P. Heimlich, "Status of Air Travel in the USA," (April 13, 2016), Ipsos Public Affairs & Airlines for America, *available at* https://www.airlines.org/wp-content/uploads/2016/04/2016Survey.pdf.

78.

The Atlanta Airport's domestic airline population reflects the general population of American air travelers. The airport currently handles more domestic passenger traffic than any other airport in the United States, and 60% of the Atlanta Airport's domestic passengers only travel through the airport to catch a connecting flight. Erick Burgueño Salas, "Leading domestic airports in U.S. in 2020," *Statista* (July 21, 2021); Matthew T. Lawder, "Which Airports Benefit the Most from Connecting Passengers."

79.

The probability that the racial disparity reflected in the jet bridge interdiction program's stop data was caused by random chance is 1 in 1,493,270,000,000,000,000,000,000,000,000,000,000,000,000,000,000,00 0,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,00 0,000,000,000,000. That is less than one grain out of all the grains of sand on earth, or less than the chance of being struck by a meteorite.

80.

Put differently, for there to be a statistically significant possibility that the racial disparities in the jet bridge stops were random, 52% of airline travelers boarding domestic flights in the Atlanta Airport would have to be Black. But, in fact, only 8% of air travelers are Black (and the passenger population at the Atlanta Airport is fairly representative of American air travelers). By the same accepted statistical standards, no more than 39 Black passengers should have been stopped if the stops were random. Yet, as described above, more than five times that number (211) were stopped.

81.

CCPD cannot claim that the jet bridge interdiction program's stark racial discrimination is unintentional, as CCPD supervisors and officials regularly receive

notice that the program's administration is racially discriminatory. CCPD officers executing the program complete and submit weekly logs recording the flight information, names, dates of birth, race, and gender of the passengers they stop. These logs also record whether or not a detained passenger allegedly "consented" to a search. The data in these logs, as summarized above, provides clear notice that the jet bridge interdiction program relies on racial profiling to select passengers for detention. The data also confirms that such racial discrimination has been routine and consistent.

82.

The allegations in this paragraph are upon information and belief. Defendant. Smith was one of the CCPD supervisory officers who regularly received and reviewed logs of passenger interdictions, providing Sgt. Smith with notice of the program's racial discrimination. Sgt. Smith failed to act to correct that racial discrimination. Sgt. Smith knew or should have known that subordinate officers were acting unlawfully, and failed to stop them from doing so. Instead, Sgt. Smith's actions furthered CCPD's customs and policies that manifested deliberate indifference to Plaintiffs' constitutional right to be free from racial discrimination.

**E. The Jet Bridge Program Seizes Almost No Drugs, but it Does Generate a Financial Windfall for CCPD.**

83.

CCPD likely targets passengers based on race because of (1) the false stereotype that being Black is a proxy for drug trafficking, (2) the reality that Black individuals are less likely to have bank accounts and therefore more likely to carry assets as cash, and (3) the fact that Black individuals are, for good reason, more wary of engaging with the legal system to challenge a wrongful seizure.

84.

As CCPD's records make clear, the department almost never finds drugs during the jet bridge passenger interdictions. The 402 jet bridge stops from August 30, 2020, to April 30, 2021, resulted in a grand total of three seizures: roughly 10 grams (less than the weight of one AAA alkaline battery) of drugs from one passenger, 26 grams (the weight of about 4 grapes) of "suspected THC gummies" from another, and 6 prescription pills (for which no valid prescription allegedly existed) from a third. Only two of the passengers (those who possessed the roughly 10 grams of drugs and the pills) were charged with a crime.

85.

Those results make common sense. As CCPD is aware, the officers implementing the jet bridge interdiction program are searching individuals who have just been through one of the most extensive security protocols in human history.

Targeting such individuals in hopes of seizing illegal drugs is senseless.

86.

Although the jet bridge interdiction program utterly fails to seize drugs, it is financially lucrative for CCPD. Over the 8-month period in question, the program seized $1,036,890.35 in cash and money orders via 25 civil asset forfeitures. Yet, of the 25 passengers who had cash seized, 24 were allowed to continue on their travels, often on the same flight, and only two were ever charged with any related crime (the same two individuals described in Paragraph 84).

87.

Eight of the 25 passengers from whom CCPD seized money challenged those seizures in court. CCPD settled each case—settlements that returned substantial amounts of the seized funds to the individuals.

88.

CCPD records reveal no indication that, aside from the money seized and two individuals charged, the 402 documented jet bridge stops led CCPD to develop or pursue any leads as to any suspected criminal activity.

89.

Carrying cash and money orders, even in large quantities, does not equate to illicit narcotics activity. It is well established, for example, that people of color are

less likely to place assets in bank accounts, making it more likely that they will be carrying substantial amounts of cash or money orders as they travel. *See, e.g.,* M. Moeser, *The data of racial disparity in financial services*, American Banker (June 19, 2020).

90.

CCPD's generation of revenue in this manner demands relatively little investment of resources from the department and its partners. The procedures used to seize cash and money orders from passengers require little of officers initiating the seizure, and transfer the onus to the owner to reclaim the property. Doing so may prove too costly, particularly for those who live outside of the jurisdiction or must hire an attorney to help navigate the process. It is also well established that Black individuals are more likely to be wary of the legal system and, accordingly, less likely to challenge a coercive search, seizure, or forfeiture. *See, e.g.,* J. Gramlich, *From police to parole, black and white Americans differ widely in their views of criminal justice system*, Pew Research Center (May 21, 2019).

91.

Given the financial windfall that the jet bridge interdiction program generates, CCPD remained motivated to continue the program—and the program's targeting of Black passengers—despite the consistent failure to find illegal drugs.

92.

Predictably and by design, the jet bridge interdiction program threatens the constitutional rights of all upon whom it is imposed. Yet, despite its evident constitutional shortcomings, including its obvious racially discriminatory administration, CCPD allowed the program to continue unchanged, showing deliberate indifference to the constitutional rights of airline passengers such as Mr. English and Mr. André.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### 42 U.S.C. §1983 – Fourth and Fourteenth Amendments to the U.S. Constitution, Unlawful Seizure

### (*Both Plaintiffs Against All Defendants*)

93.

Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

94.

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people . . . against unreasonable searches and seizures."

95.

"The security of one's privacy against arbitrary intrusion by the police—

which is at the core of the Fourth Amendment—is basic to a free society." *Wolf v. Colorado*, 338 U.S. 25, 27–28 (1949). Yet, as detailed above, the Defendants have designed and implemented a drug interdiction program that enables officers arbitrarily to single out, seize, and search passengers in jet bridges at the Atlanta Airport. Such passenger seizures are unreasonable; they are neither grounded in individualized suspicion, nor subject to any standard to limit officer discretion.

96.

In the course of enforcing the jet bridge interdiction program, Defendants Griffin and Campbell violated Plaintiff English's right under the Fourth Amendment to be free from unreasonable seizures. By stopping Mr. English in a narrow and highly-restricted jet bridge, obstructing his path to the plane, requiring that he move to the side of the jet bridge, and retaining his ID and boarding pass during questioning, Defendants seized Mr. English with neither individualized suspicion nor any checks on their discretion. This suspicionless and standardless seizure was unreasonable.

97.

Six months later, as part of the same jet bridge interdiction program, Defendants Branham and Hooks violated Plaintiff André's right under the Fourth Amendment to be free from unreasonable seizures. Defendants seized Mr. André on

an Atlanta jet bridge when they obstructed his path to the plane, presented their badges, and retained his ID and boarding pass during questioning, all without any individualized suspicion and without any limitations on the officers' discretion. The seizure was unreasonable.

98.

Defendant Smith was a supervisor on notice of the CCPD practice of unreasonably seizing passengers on jet bridges. He knew or should have known that subordinate officers were acting unlawfully, and he failed to correct the constitutional violations.

99.

The constitutional violations committed against Mr. English and Mr. André were caused by Clayton County policies and customs. In particular, CCPD and Chief Roberts operated a program that instructed and permitted officers to seize passengers on jet bridges without any individualized suspicion or limitations on officer discretion. Clayton County, through its policymakers CCPD and Chief Roberts, knew or should have known that the design and operation of this program violated the Fourth Amendment rights of Plaintiffs and others who were stopped. CCPD's failure to provide any written guidelines to constrain officer discretion further manifests the Defendants' deliberate indifference to Plaintiffs' constitutional rights,

particularly given the inherently coercive environment where the CCPD program operated.

100.

The Defendants conducted the above-described actions under color of state law, in violation of the Plaintiffs' clearly established constitutional rights.

**SECOND CAUSE OF ACTION**

**42 U.S.C. §1983 – Fourth and Fourteenth Amendments to the U.S. Constitution, Unlawful Search**

***(Plaintiff Clayton English Against Defendants Clayton County, Kevin Roberts, Tony Griffin, Kayin Campbell, and C. Smith)***

101.

Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

102.

Any search conducted by law enforcement must be grounded in probable cause, supported by a warrant or an exception to the warrant requirement, or be based in voluntary consent. "[T]he Fourth and Fourteenth Amendments require that a consent [to a search] not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Yet, as described above, Defendants have designed and implemented a drug interdiction

-35-

program that requires officers to stop airline passengers in narrow and highly-restricted jet bridges, detain them without a warrant or any individualized suspicion, retain their IDs and boarding passes during questioning, and, aware of the psychological pressures of commercial air travel in the post-9/11 security environment, "ask" those passengers to let them search their belongings. Searches made pursuant to that protocol are coercive and unconstitutional.

103.

In the course of implementing this program, Defendants Griffin and Campbell unlawfully detained Plaintiff English, held onto his boarding pass and ID, "asked" to search his luggage, and in fact conducted the search. Mr. English provided no voluntary consent for that search that was free from coercion or independent of the illegal seizure that preceded it. The search violated Mr. English's Fourth Amendment right to be free from unreasonable searches.

104.

Defendant Smith was a supervisor on notice of the CCPD practice of unreasonably searching passengers on jet bridges. He knew or should have known that subordinate officers were acting unlawfully, and he failed to correct the constitutional violations.

105.

The constitutional violations committed against Mr. English were caused by Clayton County policies and customs. CCPD and Chief Roberts operated a program that instructed and permitted officers to search the luggage of passengers on jet bridges without any individualized suspicion or limitations on officer discretion. Clayton County, through its policymakers CCPD and Chief Roberts, knew or should have known that the design and operation of this program violated the Fourth Amendment rights of Mr. English and others who were searched. CCPD's failure to provide any written guidelines to constrain officer discretion further manifests the Defendants' deliberate indifference to Mr. English's constitutional rights, particularly given the inherently coercive environment where the CCPD program operated.

106.

The Defendants conducted the above-described actions under color of state law, in violation of Mr. English's clearly established constitutional rights.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983 – Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution**

**(*Both Plaintiffs Against All Defendants*)**

107.

Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

108.

The Equal Protection Clause of the Fourteenth Amendment prohibits discriminatory enforcement of the law. *Yick Wo v. Hopkins*, 118 U.S. 356, 367 (1886). This includes "selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).

109.

Defendants have designed and implemented an airport drug interdiction program that uses race to selectively target air passengers for interrogations, seizures, and searches. As detailed above, the program has a starkly discriminatory effect and is motivated by discriminatory purpose.

110.

In the course of executing this discriminatory program, Defendants violated the equal protection rights of Plaintiffs, two Black men, when they singled them out on the basis of race for interrogation, seizures, and searches.

111.

Defendant Smith was a supervisor on notice of the racial discrimination in the

CCPD jet bridge interdiction program. He knew or should have known that subordinate officers were acting unlawfully, and he failed to correct the constitutional violations.

112.

The equal protection violations committed against Mr. English and Mr. André were caused by Clayton County policies and customs. CCPD and Chief Roberts operated a program pursuant to which officers used race as the motivating factor in deciding to stop Plaintiffs for interdiction. CCPD and Chief Roberts knew or should have known that the program discriminated on the basis of race, yet they took no steps to remedy that discrimination. Through both their actions and inaction, CCPD and Chief Roberts were deliberately indifferent to Plaintiffs' constitutional rights.

113.

The Defendants conducted the above-described actions under color of state law, in violation of Plaintiffs' clearly established constitutional rights.

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983 – Civil Rights Act of 1866, 42 U.S.C. § 1981**

**(*Both Plaintiffs Against All Defendants*)**

114.

Plaintiffs incorporate by reference the foregoing paragraphs of this

Complaint as though fully set forth herein.

### 115.

Section 1981 of the Civil Rights Act of 1866 guarantees the "full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a). It further assures that all persons "shall be subject to like punishment, pains, [and] penalties." 42 U.S.C. § 1981(a).

### 116.

Section 1981 "has broad applicability" in forbidding racial discrimination. *Mahone v. Waddle*, 564 F.2d 1018, 1028 (3d Cir. 1977). Specifically, it proscribes selective police enforcement on the basis of race. *See id.; Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).

### 117.

As described above, Defendants' jet bridge interdiction program uses race to selectively target air passengers for interrogations, seizures, and searches. This program deprives Black passengers of the "full and equal benefit" of the law, and it subjects them to unequal "punishment, pains, [and] penalties." 42 U.S.C. § 1981(a).

### 118.

In the course of executing this discriminatory program, Defendants violated the rights of Plaintiffs under § 1981 when they singled them out based on race for

interrogation, seizures, and searches.

119.

Defendant Smith was a supervisor on notice of the racial discrimination in the CCPD jet bridge interdiction program. He knew or should have known that subordinate officers were acting unlawfully, and he failed to correct these civil rights violations.

120.

The violations of Plaintiffs' rights under § 1981 were caused by longstanding CCPD policies and customs in enforcing the jet bridge interdiction program. Those policies and customs permitted and encouraged officers to use race when deciding which passengers to target, as previously described.

121.

The Defendants conducted the above-described actions under color of state law, in violation of Plaintiffs' clearly established federal rights.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request the following relief:

    a)  A trial by jury on each of the Plaintiffs' claims;

    b)  A declaration that the CCPD jet bridge interdiction program violates (1) the Fourth and Fourteenth Amendments to the United States Constitution,

(2) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (3) section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

c) A declaration that the acts of Defendants' Branham, Hooks, Griffin, Campbell, and Smith, taken in their individual capacities, violated (1) Plaintiffs' rights as guaranteed by the Fourth Amendment to the United States Constitution; (2) Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and (3) Plaintiffs' rights under section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

d) Compensatory damages to Plaintiffs against all Defendants, jointly and severally, in an amount to be determined at trial;

e) Punitive damages against all Defendants, jointly and severally, in an amount to be determined at trial;

f) Pre-judgment and post-judgment interest and an award of the costs of this action against all Defendants, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and/or 18 U.S.C. § 1964(c); and

g) Such other and further relief as the Court deems just and proper.

Dated: October 11, 2022                    Respectfully submitted,


                                           */s/ Richard H. Deane, Jr.*
Allegra J. Lawrence                        Richard H. Deane, Jr.
  (Georgia Bar No. 439797)                   (Georgia Bar No. 214875)
Rodney J. Ganske                           Peter C. Canfield
  (Georgia Bar No. 283819)                   (Georgia Bar No. 107748)
**LAWRENCE & BUNDY LLC**                    Rebecca M. Nocharli
1180 West Peachtree St., NW, Ste 1650        (Georgia Bar No. 633621)
Atlanta, Georgia 30309                     **JONES DAY**
Telephone: (404) 400-3350                  1221 Peachtree St. N.E., Suite 400
Facsimile: (404) 609-2504                  Atlanta, Georgia 30361
allegra.lawrence-                          Telephone: (404) 521-3939
hardy@lawrencebundy.com                    Facsimile: (404) 581-8330
rod.ganske@lawrencebundy.com               rhdeane@jonesday.com
                                           pcanfield@jonesday.com
                                           rnocharli@jonesday.com
Barry Friedman*
Farhang Heydari*
Annie Hudson-Price*
Paul Meyer*
**POLICING PROJECT**
**AT NYU SCHOOL OF LAW**
Washington Square Legal Services,
Inc.
40 Washington Square South, Ste 302
New York, NY 10012
Telephone: (212) 992-6950
barry.friedman@nyu.edu
farhang.heydari@nyu.edu
annie.hudsonprice@nyu.edu
paul.meyer@nyu.edu
*\* Application for admission*
*pro hac vice forthcoming*


                    ***Counsel for Plaintiffs***


                              -43-

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1C of the Northern District of Georgia, using 14-point Times New Roman font, as approved by the Court.

Dated: October 11, 2022                    Respectfully submitted,

<u>*/s/ Richard H. Deane, Jr.*</u>
Richard H. Deane, Jr.

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 11, 2022, I have caused a copy of the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

*/s/ Richard H. Deane, Jr.*
Richard H. Deane, Jr.

*Counsel for Plaintiffs*