IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ERIC ANDRÉ, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 1:22-cv-04065-MHC |
| v. | ) | |
| | ) | |
| CLAYTON COUNTY, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### A.   Branham, Hooks, Griffin, Campbell, And Smith Are Entitled To Qualified Immunity

#### a.   *Unlawful Seizure And Search Claims (Count I and II)*

In their initial brief, defendants established that qualified immunity bars plaintiffs' unlawful seizure and search claims because plaintiffs were involved in a consensual encounter in a public airport and defendants did not violate clearly established law under the particular allegations in this case. (Doc. 25-1, pp. 5-9.)

In response, plaintiffs rely entirely on United States v. Berry, 670 F.2d 583 (5th Cir. Unit B 1982) to support their contention that the "Complaint clearly states Fourth Amendment violations." (Doc. 29, pp. 15-16.) Plaintiffs contend that Berry clearly establishes that "officers effect an unreasonable seizure in an airport when they, without individualized suspicion, make a display of authority, obstruct a passenger's path, take his identification and ticket, do not notify the passenger he

is free to terminate the encounter, and interrogate him about narcotics." (Id.) However, plaintiffs are misguided on the scope of Berry. As discussed below, Berry does not clearly establish any Fourth Amendment violations in this case.

In Berry, while being escorted to a DEA office located in the airport, the criminal defendants there asked if they had violated any law, and the DEA agent escorting them replied that they had violated Georgia law by falsely identifying themselves but that "there would be no problem" if they were not carrying drugs. Id. at 589. Although the court commented that "it is likely that [the criminal defendants'] violation of Georgia law by falsely identifying themselves to police officers would provide the probable cause necessary for the office detention," the court declined to uphold the search on this ground, holding instead that the search was authorized by the defendants' consent. Id. at 604. The court went on to emphasize the importance of permitting voluntary interaction between police and citizens and concluded that the interaction in that case did not bring the Fourth Amendment into play. Id. at 590-91.

As plaintiffs highlight, Berry recognized some factors for courts to consider when evaluating whether there was coercion in a voluntary encounter, such as whether an officer retained an individual's ticket "for more than a minimal amount of time or by taking a ticket over to a ticket counter," statements by an officer indicating that an individual is suspected of smuggling drugs, statements which

intimate that investigation is focused on a specific individual, informing an individual that an innocent person would cooperate with police, and requiring an individual to proceed against his will from a concourse to an office.  Berry, 670 F.2d at 597. But the court in Berry found that the encounter did not elevate to a seizure until the individuals were "required to walk to a nearby office."  Berry, 670 F.2d at 602.  As the court emphasized:

> Requiring an individual to accompany police to an office indicates a detention for a time period longer than that permitted in a seizure; cuts the individual off from the outside world, without indication of when he might be allowed to leave; places him in unfamiliar surroundings; may subject him to increased implicit police pressure; and leaves him without third parties to confirm his story of events that may have occurred, should his story differ from that of police.

Id. at 602.  The level of intrusion in Berry, however, is entirely absent here.

While plaintiffs also point out that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way" is another factor recognized in Berry, this factor was not applied in that case, and more importantly, Berry emphasized that courts "should closely scrutinize" the "totality of circumstances of an airport stop[.]"  Berry, 670 F.2d at 597.  Understandably, the Berry court held that it  "**cannot** provide a catalog of all factors that might be relevant to a court's inquiry[.]"  Id. (emphasis added). This makes sense considering the unique context of airport travel in 1982 when Berry was decided,

compared to now (40 years later) where airport travel is remarkably different considering post 9/11, the 2001 Aviation and Transportation Security Act which established the Transportation Security Administration ("TSA"), the evolving laws legalizing recreational drugs, and the opioid epidemic, among other differences.

Here, the totality of the circumstances involving plaintiffs and Atlanta Airport in 2020 and 2021 (40 years removed from <u>Berry</u>) do not implicate the Fourth Amendment. Under the "reasonable person" objective standard,[1] and under the unique context of airport travel in today's day and age – where travelers are constantly asked where they are going, luggage is scanned by TSA and opened and searched, identification and boarding passes are routinely provided to TSA and airline employees, people are subject to full body X-ray and intimate physical pat downs by TSA, TSA requires certain travelers to step aside for additional searches, and TSA even uses swabbing of hands to detect explosive material[2] – an objectively reasonable innocent person in plaintiffs' shoes would not have concluded that their liberty had been restrained, especially when boarding a flight to Los Angeles, a city where marijuana is legal and is known as a hotbed for drug

---

[1] "No bright-line rule applicable to all investigatory pursuits can be fashioned. Rather, the appropriate test is whether a reasonable man, viewing the particular police conduct as a whole and within the setting of all of the surrounding circumstances, would have concluded that the police had in some way restrained his liberty so that he was not free to leave." <u>Michigan v. Chesternut</u>, 486 U.S. 567, 567 (1988).

[2] <u>See</u> Doc. 24, ¶¶ 24-27, 48.

trafficking.[3] <u>Regions Bank v. Kaplan</u>, No. 17-15478, 2021 WL 4852268, at *13 and n. 4 (11th Cir. Oct. 19, 2021) (finding that the Court may take judicial notice of matters that are public knowledge on a motion to dismiss).

Turning to the circumstances at the jet bridge tunnel, the officers were in plainclothes and are not alleged to have been carrying weapons. The officers "asked" for plaintiffs' boarding passes and identification; they did not demand them and did not retain them for an inordinate amount of time – in fact, plaintiffs were still able to board their flight and continue their travel. Additionally, the officers did not attempt to remove plaintiffs from the public jetway and take them to an office for interrogation, as in <u>Berry</u>. Plaintiffs were asked basic questions about whether they were carrying any illegal drugs; they were not accused of any crimes.  (Doc. 24, ¶¶ 51-58; 30-46.) The officers did not tell plaintiffs that they were the targets of any investigation; the officers did not make any suggestion of guilt or consequences for refusing to cooperate, either.  The officers never physically touched plaintiffs and never placed them under arrest. The officers did not restrain plaintiffs in any way.  The officers did not threaten plaintiffs, use threatening or intimidating language or tone of voice, question them outside the presence of the public, make any demands, or speak with plaintiffs for an

---

[3] https://www.justice.gov/archive/ndic/pubs0/668/overview.htm.

inordinate amount of time. Finally, plaintiffs never asked if they were free to leave, never requested to board their flight, and were never told that they couldn't.

Even factors that courts have identified as circumstances that might render consent involuntary during airport travel 40 years ago—e.g., an officer coercing the individual to move from a public area to a private area or office, United States v. Elsoffer, 671 F.2d 1294, 1298 (11th Cir.1982); Berry, 670 F.2d at 604; an officer asking questions or making statements that would lead a reasonable individual to believe that he or she had been singled out as suspicious, United States v. Chemaly, 741 F.2d 1346, 1349 (11th Cir. 1984); United States v. Elsoffer, 671 F.2d 1294, 1298 (11th Cir. 1982); Berry, 670 F.2d at 597; or an officer informing the individual that an innocent person would cooperate with the police, United States v. Setzer, 654 F.2d 354, 357–58 (5th Cir. Unit B 1981), cert. denied, 459 U.S. 1041 (1982)—are not present in this case.

While plaintiffs were approached and questioned by plainclothes officers, the mere fact that this occurred while in a jet bridge as they were boarding their flights, does not, in itself, render plaintiffs' decisions to answer questions or even English's consent to search his bag involuntary. The question in this case is whether plaintiffs were seized under the Fourth Amendment, not whether they were stopped or questioned, which occurs daily to every traveler going through TSA security checkpoints. When applying the objectively reasonable person

standard to airport travel in today's day in age and the totality of the circumstances, the Court should find that plaintiffs fail to allege any constitutional violation.

### b.    *Equal Protection Claim (Count III)*

Plaintiffs contend in response that they have stated an equal protection claim because the jet bridge interdiction program has a "discriminatory effect" and plaintiffs allege a "discriminatory purpose." (Doc. 29, pp. 21-26.) To establish discriminatory effect in a racial discrimination case, plaintiffs must identify similarly-situated individuals of a different race who were not subjected to the same treatment as plaintiffs. United States v. Armstrong, 517 U.S. 456, 465 (1996). In cases alleging racial profiling by police officers, plaintiffs can prove that they were treated differently than other similarly-situated individuals by identifying such individuals or through statistics on traffic stops by the defendant police department. Chavez v. Ill. State Police, 251 F.3d 612, 636 (7th Cir. 2001). Once plaintiffs have shown discriminatory effect, they must prove that the defendants' actions were also motivated by a discriminatory purpose. "Discriminatory purpose ... implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979).

### i.    *No Discriminatory Effect*

In an effort to show discriminatory effect, plaintiffs contend that the jet bridge interdiction program disproportionately targets Black passengers based on their claim that 56% of stops were of Black passengers.  (Doc. 29, pp. 21-22.)  But plaintiffs do not provide any statistics to show what percentages of travelers at the Atlanta Airport or even on flights to and from Los Angeles are Black, and their reliance on statistics of Black travelers across the nation is virtually meaningless here.[4]   Moreover, even giving plaintiffs' statistics maximum weight and credence, the fact that half of the people that have been stopped as part of the program are Black does not show even a de minimis discriminatory effect on Black people, but actually shows a proportional effect on Black travelers and other races.  Robinson v. City of Dallas, 514 F.2d 1271, 1273 (5th Cir. 1975) (no discriminatory effect where three of the five employees disciplined under the "just debts" rule were

---

[4] Courts have found fatal flaws in similar racial profiling statistics offered by plaintiffs in support of their claims.  Chavez v. Illinois State Police, 251 F.3d 612, 645 (7th Cir. 2001); United States v. Alcaraz-Arellano, 302 F. Supp. 2d 1217 (D. Kan. 2004), aff'd, 441 F.3d 1252 (10th Cir. 2006); United States v. Barlow, 310 F.3d 1007, 1011-12 (7th Cir. 2002) (citing the flawed statistical methodology of the plaintiff's expert in rejecting plaintiff's claim of discriminatory enforcement by agents of the DEA).  As these cases demonstrate, courts are skeptical of statistics that purport to prove discriminatory effect in racial profiling cases. In most instances, and as in the case at bar, courts have found significant flaws in the statistics offered by complainants that have resulted in the dismissal of their equal protection-based claims on the ground that they did not sufficiently identify a pool of similarly situated persons of another race who could have been stopped by the police but were not.

Black); Griggs v. Duke Power Co., 401 U.S. 424, 426 (1971) (statistical disparity found when requirements operated to disqualify blacks at a substantially higher rate than whites—a markedly different situation from the instant case). Moreover, the percentage effect on Black people has to be "significantly greater" than non-Black people, or "bears more heavily" on Black people, but plaintiffs provide no such comparative data. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1217 (11th Cir. 2008); Greater Birmingham Ministries v. Sec'y of State for State of Alabama, 992 F.3d 1299, 1321 (11th Cir. 2021).

Moreover, raw statistics show nothing about similarly situated individuals. United States v. Cannon, 987 F.3d 924, 937–38 (11th Cir.), cert. denied sub nom. Holton v. United States, 211 L. Ed. 2d 132, 142 S. Ct. 283 (2021) ("Statistical data reflecting the treatment of only one particular group cannot satisfy the discriminatory effect prong because it fails to show that similarly situated persons were treated differently."). Plaintiffs do not contend anywhere in the complaint that "similarly situated" non-Black individuals to plaintiffs received different treatment. Thus, for these reasons, plaintiffs fail to show discriminatory effect.

## ii. *No Discriminatory Purpose*

Even if plaintiffs can show discriminatory effect, which they cannot, plaintiffs must still show purposeful discrimination to make out a constitutional violation for the unequal enforcement of the jet bridge interdiction program, a

facially-neutral policy. Plaintiffs do not contend that they were intentionally targeted because of their race or that the program or any enforcement is racially motivated. Instead, plaintiffs attempt to show purposeful discrimination based on the same statistics discussed above, contending that the program results in a "stark" impact on Black people. (Doc. 29, pp. 24-26.) However, as discussed above, this simply is not the case.[5] Moreover, most courts have stated that statistics, by themselves, are insufficient to prove discriminatory purpose in racial profiling cases. United States v. Barlow, 310 F.3d 1007, 1011 (7th Cir. 2002) (statistics are rarely sufficient to prove an equal protection violation); Chavez, 251 F.3d at 647 (statistics may not serve as sole proof of discriminatory intent in a racial profiling case).

In McCleskey v. Kemp, 481 U.S. 279, 286 (1987), for instance, the defendant challenged the constitutionality of Georgia's death penalty system on Eighth and Fourteenth Amendment grounds. In support of his claims, he offered a statistical analysis which showed that in the aggregate, Black defendants who

---

[5] Purposeful discrimination can be shown by circumstantial evidence. For example, purposeful discrimination can be indirectly proven by a "stark" pattern of adverse impact on a particular group. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266 (1977). "[S]uch cases are rare." Id. at 266 (1977); Gomillion v. Lightfoot, 364 U.S. 339 (1960) (complaint alleging that local act which altered shape of city from a square to a 28-sided figure and had as its effect the removal from city of all but four or five of its 400 Black voters although not removing a single white voter or resident, constituted a discrimination against Black petitioners); Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

murdered White victims were more likely to receive a death sentence than other victim-offender racial combinations.  According to the defendant, this statistical evidence proved that he was discriminated against because of his race and the race of his victim.  In adjudicating McCleskey's Fourteenth Amendment claim, the Supreme Court assumed the validity of the statistical analysis on which it was based.  Nevertheless, the Court rejected his equal protection argument, holding that the statistical evidence failed to demonstrate that decision-makers had acted with discriminatory purpose in his specific case, which the Court held was a predicate to recovery on equal protection grounds.  Plaintiffs here, as in McCleskey, fail to make any statistical showing in the complaint of discriminatory purpose. Therefore, because plaintiffs fail to show discriminatory purpose, their equal protection claim must be dismissed.

  *c.*  ***No Constitutional Violation By Smith Under Supervisory Liability***

  In their initial brief, defendants established that plaintiffs' supervisory liability claim against Smith is barred by qualified immunity because: (1) plaintiffs fail to allege any underlying constitutional violations; (2) plaintiffs' vague and conclusory allegations are insufficient to establish a causal connection; and (3) plaintiffs do not allege facts to show a "history of widespread abuse" or "pattern of similar constitutional violations" which put Smith on notice of a need to correct a known deficiency in the jet bridge interdiction program and that he acted with

deliberate indifference as to same. (Doc. 25-1, pp. 13-16.) In response, plaintiffs contend that they have established a history of widespread abuse based on a single district court case – Noell v. Clayton Cnty., No. 1:15-CV-2404-AT, 2016 WL 11794207 (NDGA, Sept. 21, 2016) – and "multiple violations dating back to 2017." (Doc. 29, p. 31.) Plaintiffs contend that these instances also support an inference that Smith knew that subordinates would act unlawfully but failed to stop them. (Id.) Finally, plaintiff contends that Smith received a log cataloging the "race of passengers interdicted" and should have taken remedial action at that time, but failed to. (Id., p. 32.)

Foremost, as discussed in defendants' initial brief, Noell is inapposite, because that case did not involve the jet bridge interdiction program, questions in the jet bridge, any equal protection claims, claims that the program disproportionately impacted Black people, or claims challenging the program. The second amended complaint in that case, which was the operative complaint before the case was dismissed, speaks for itself and a cursory review of same reveals that it has no bearing here.[6]

---

[6] Also unlike the case at bar, Noell involved claims against the United States of America, U.S. Customs and Border Protection, and U.S. Department of Homeland Security and allegations involving a 3 hour search in an office outside of the main terminal, relocation to an interrogation room by car, and the seizure of $20,200 in cash. (See Noell Second Amended Complaint at Doc. 43.)

As for plaintiffs' reference to prior "multiple violations," the amended complaint actually only identifies two: one involving Preston Lewis in 2017 and another involving Jean Elie in 2019. (Doc. 24, pp. 32-38.) Without even reaching the merits, these prior incidents are quantitatively insufficient to establish widespread abuse.[7] In Clark v. Evans, for example, the Eleventh Circuit stated that "it is clear that four cases in four years would have been insufficient to put [a supervisory official] on notice...." 840 F.2d 876, 885 (11th Cir.1988). In Hawk v. Klaetsch, similarly, the Eleventh Circuit stated: "We fail to see how three incidents over the span of nearly five years can constitute frequent, widespread, or rampant abuse." 522 Fed. Appx. 733 (11th Cir. 2013). Here, the two isolated examples with the addition of Noell over a span of several years cannot quantitively establish

---

[7] See  Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1252 (11th Cir. 2010) (finding that two incidents of sexual harassment did not constitute a history of widespread abuse); Pineda v. City of Houston, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents ... cannot support a pattern of illegality in one of the Nation's largest cities and police forces."); Prieto v. Metro. Dade Cnty., 718 F.Supp. 934, 938–39 (S.D.Fla. 1989) (stating that "four isolated incidents involving only [the plaintiff] fall well short of proving a persistent and widespread practice sufficient to establish a policy or custom"); Whitaker v. Miami-Dade Cnty., 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015) ("four isolated shootings in 2012 cannot establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."); Anderson v. Jackson, No. CIV A 1:08CV175-MHT, 2009 WL 2601388, at *4 (M.D. Ala. Aug. 21, 2009) (79 excessive-force complaints were filed against it between 1988 and 2008; seven lawsuits alleging excessive force between 2004 and 2009; five lawsuits involving "similar civil rights violations" previously; and five individuals have been killed in the course of arrests by Dothan police were all insufficient to establish liability).

widespread abuse. Even if they were sufficiently numerous to establish a consistent and widespread practice, which they are not, a substantive review of these examples reveals no actual findings of constitutional violations. Moreover, plaintiffs do not contend that Smith knew about these three incidents. Consequently, no inference can be drawn that Smith knew of these incidents, knew of any unlawful conduct, or was deliberately indifferent to any policy or practice with respect to same. Finally, even if Smith was aware of any statistic showing 56% of stops involved Black people, it is axiomatic that this cannot in and of itself have alerted Smith of "obvious, flagrant, [and] rampant" violations of the Constitution, or even notice of a deficiency of the program.[8] Therefore, plaintiffs' supervisory liability claim against Smith should be dismissed.

### d. *No Violation Of Clearly Established Law*

Defendants established in their initial brief that even if there are sufficient allegations to support a constitutional violation, the individual officers are still entitled to qualified immunity because there is no controlling precedent that clearly establishes a violation of any constitutional rights under the unique facts alleged in

---

[8] West v. Tillman, 496 F.3d 1321, 1329 (11th Cir. 2007) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."); Watkins v. Willson, 824 F. App'x 938, 941 (11th Cir. 2020) ("a plaintiff ordinarily must show a pattern of similar constitutional violations by untrained employees because [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

this case, the gravamen of which involves questions by plainclothes officers in 2020/2021 to travelers in a jet bridge tunnel while boarding flights to Los Angeles. (Doc. 25-1, pp. 17-18.)  It is the plaintiffs' burden to overcome qualified immunity by establishing this conduct was a violation of clearly established law. White v. Pauly, 137 S. Ct. 548, 552 (2017) ("clearly established law must be 'particularized' to the facts of the case"); Gaines v. Wardynski, 871 F.3d 1203, 1207 (11th Cir. 2017) (reversing where "clearly established law" at too high a level of generality).

Plaintiffs have cited no cases particularized to the facts alleged here to show a clear violation of plaintiffs' constitutional rights under the unique circumstances of this case.  Not a single case cited by plaintiffs clearly establish that defendants had fair and clear warning that plainclothes officers violate the Constitution if they inquire from a traveler in a jet bridge tunnel whether they are transporting any illegal drugs while boarding a flight to a city widely known to be a drug trafficking hotbed, or ask to search luggage at an airport.  Therefore, each of the individual defendants are entitled to qualified immunity.

## B.    <u>Failure To State A Claim Against The County Under Monell</u>

Defendants established in their initial brief that plaintiffs' complaint fails to allege a claim under <u>Monell</u> because (1) plaintiffs' constitutional rights were not violated; and (2) plaintiffs fail to allege sufficient facts to establish that the jet

bridge interdiction program was adhered to by the County with deliberate indifference. (Doc. 25-1, pp. 18-22.)

In response, plaintiffs contend that the jet bridge program was a longstanding practice accepted by CCPD and that the program operated for at least seven years before plaintiffs were interdicted. (Doc. 29, p. 27.) But the existence of a practice, no matter the duration, is not enough to meet the "high" standard for holding a county liable under Section 1983. Denham v. Corizon Health, Inc., 675 F. App'x 935, 944 (11th Cir. 2017). Plaintiffs must show that the practice "constituted deliberate indifference to [plaintiffs'] constitutional right[s]." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). To meet this burden, plaintiffs must demonstrate that the practice continued with "'deliberate indifference' as to its known or obvious consequences." Id. at 1291. Plainly stated, a "showing of simple or even heightened negligence is not enough." Id. Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a county, either. Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011). "A pattern of similar constitutional violations ... is 'ordinarily necessary.'" Craig, 643 F.3d at 1310. Finally, "[b]efore it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had 'actual or constructive notice that the particular omission is

substantially certain to result in the violation of the constitutional rights of their citizens.'" Young v. City of Augusta, Ga., 59 F.3d 1160, 1172 (11th Cir. 1995).

In an effort to establish that the County was deliberately indifferent, plaintiffs again contend that Noell, the encounters involving Lewis and Elie, and "statistical evidence" should have put the County on notice of the unconstitutionality of this practice, yet the "Department…did nothing to stop" it. (Doc. 29, pp. 28-29.)  As discussed above, however, this is insufficient to put anyone on notice that the jet bridge interdiction program was causing a pattern of constitutional violations.  There is nothing about these encounters, the jet bridge interdiction program, or even the statistics derived from the log which would make it "plainly obvious" to the County of the need to take action.  See, e.g., Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (holding that the plaintiff failed to prove failure to train claim in Section 1983 action because "the need for such training must be plainly obvious to" the final decision-makers and the district court had "found no evidence of a history of widespread prior abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision").  Consequently, without any such notice by the County, plaintiffs cannot show deliberate indifference.  Therefore, for these reasons, plaintiffs' Monell claim should be dismissed.

## C.   **Official Capacity Claims Are Duplicative And Should Be Dismissed**

Plaintiffs offer no response and these claims should be deemed abandoned.[9]

## D.  No Viable Section 1981 Claim

Defendants established that plaintiffs' § 1981 claims must be dismissed because: (1) § 1983 provides the exclusive remedy for the alleged violation of rights secured by § 1981; and (2) plaintiffs fail to identify any impaired contractual relationship under which the plaintiffs have rights.  (Doc. 25-1, pp. 23-24.) Plaintiffs contend in response that they "bring a § 1983 claim for violation of the rights created by § 1981," citing Holmes v. City of Ft. Pierce, Fla., No. 20-13170, 2022 WL 247976, at *1 (11th Cir. Jan. 27, 2022).  (Doc. 29, pp. 24-25.)   In Holmes, the Eleventh Circuit recognized that "[w]hen a plaintiff sues a state actor under section 1981 for damages for an alleged violation of his rights, he must proceed under section 1983."   2022 WL 247976 at *4. See Butts v. Cnty. of Volusia, 222 F.3d 891, 892 (11th Cir. 2000) ("[A] plaintiff must use the remedial provisions of [section] 1983 to enforce against state actors the rights created by [section] 1981.").   Thus, plaintiffs cannot maintain a standalone claim under Section 1981, and because their Section 1983 claims should be dismissed as discussed above and in defendants' initial brief, plaintiffs' Section 1981 claim

---

[9] Hooper v. City of Montgomery, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (concluding that a plaintiff's failure to respond to claims in a defendant's motion to dismiss resulted in dismissal of those claims as abandoned); Kramer v. Gwinnett County, Ga., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."); cf. LR 7.1B.

should be dismissed.  <u>Mahoney v. Owens</u>, 818 F. App'x 894, 897 (11th Cir. 2020).

Plaintiffs, moreover, provide no clearly established law from the Eleventh Circuit, Supreme Court, or Georgia Supreme Court to support a viable Section 1981 claim in the context of a consensual airport encounter, let alone an airport search or seizure, against officers individually.  Indeed, the Eleventh Circuit has only recognized a viable Section 1981 claim brought pursuant to Section 1983 in limited circumstances, such as in the context of race discrimination claims brought under Title VII[10]  and against a municipality alleging racial discrimination caused by a policy or custom in the <u>Monell</u> framework.[11]  For this additional reason, plaintiffs' Section 1981 claim against the individual officers should be dismissed.

### E.    <u>Plaintiffs Are Not Entitled To Declaratory Relief</u>

Defendants cited Eleventh Circuit precedent in their initial brief to show that plaintiffs' claims for declaratory relief should be denied for three reasons: (1) no underlying constitutional violations; (2) failure to allege absence of an adequate remedy at law; and (3) failure to allege a serious risk of continuing irreparable injury to plaintiffs if the declaratory relief is not granted.  (Doc. 25-1, pp. 24-25.)

In response, plaintiffs contend they are not required to show a risk of continuing irreparable injury or the absence of an adequate remedy at law to obtain

---

[10] <u>Cobb v. Floyd</u>, No. 21-10535, 2022 WL 856074, at *2 (11th Cir. Mar. 23, 2022); <u>Lewis v. City of Union City</u>, 934 F.3d 1169, 1185 (11th Cir. 2019).
[11] <u>Butts</u>, 222 F.3d at 892; <u>Holmes v. City of Ft. Pierce, Fla.</u>, No. 20-13170, 2022 WL 247976, at *3 (11th Cir. Jan. 27, 2022).

declaratory relief.  (Doc. 29, p. 25.) However, plaintiffs disregard the well-settled law to the contrary.  Bolin v. Story, 225 F.3d 1234, 1242 (11th Cir.2000) ("In order to receive declaratory or injunctive relief, plaintiff [ ] must establish that there was a [constitutional] violation, that there is a serious risk of continuing irreparable injury if the relief is not granted, and the absence of an adequate remedy at law."). See also Barney v. Escambia Cnty., No. 3:17CV3-MCR-CJK, 2018 WL 4113369, at *3 (N.D. Fla. May 30, 2018) (dismissing claims of declaratory relief against a sheriff where plaintiff's allegations of improper arrest fail to establish risk of continuing irreparable injury to the plaintiff and plaintiff asserted an action for damages against the sheriff for alleged constitutional violations, which is an adequate remedy at law).

Instead, plaintiffs boldly rely on Supreme Court opinions from fifty years ago.  (Doc. 29, p. 25) (citing Steffel v. Thompson, 415 U.S. 452 (1974) and Powell v. McCormack, 395 U.S. 486 (1969)).  However, neither Steffel nor Powell support plaintiffs' contention and neither of those cases involve Section 1983 claims.  Therefore, plaintiffs' claim for declaratory relief should be dismissed.

**F.    Punitive Damages Claim**

Plaintiffs do not dispute that the County and the official capacity defendants are immune from punitive damages.  (Doc. 33, p. 25.)

**FREEMAN MATHIS & GARY, LLP**

*/s/ A. Ali Sabzevari*
Jack R. Hancock
Georgia Bar No. 322450
jhancock@fmglaw.com
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com
Chandler J. Emmons
Georgia Bar No. 310809
cjemmons@fmglaw.com

661 Forest Parkway, Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

Attorneys for Defendants

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing memorandum of law has been prepared in accordance with Local Rule 5.1(C) (Times New Roman font, 14 point).

This 14th day of March, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ A. Ali Sabzevari*
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com

661 Forest Parkway, Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served the foregoing **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to all counsel of record.

This 14th day of March, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ A. Ali Sabzevari*
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com

661 Forest Parkway, Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)