IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC ANDRÉ and CLAYTON
ENGLISH,

      Plaintiffs,

v.

CLAYTON COUNTY, GEORGIA,
KEVIN ROBERTS, in his official
capacity as Chief of the Clayton
County Police Department; AIMEE
BRANHAM, individually and in her
official capacity as a police officer of
the Clayton County Police
Department; MICHAEL HOOKS,
individually and in his official
capacity as an investigator of the
Clayton County District Attorney;
TONY GRIFFIN, individually and in
his official capacity as a police officer
of the Clayton County Police
Department; KAYIN CAMPBELL,
individually and in his official
capacity as a police officer of the
Clayton County Police Department;
and CAMERON SMITH,
individually and in his official
capacity as a police sergeant of the
Clayton County Police Department,

      Defendants.

CIVIL ACTION FILE

NO. 1:22-CV-4065-MHC

## ORDER

This case comes before the Court on Defendants' Motion to Dismiss

Plaintiffs' First Amended Complaint [Doc. 25].

## I.     BACKGROUND[1]

### A.     The October 30, 2020, Incident

On October 30, 2020, Plaintiff Clayton English ("English") arrived at

Atlanta's Hartsfield-Jackson International Airport (the "Atlanta Airport") to depart

on a flight from Atlanta to Los Angeles, California.  Am. Compl. ¶ 23.  After

proceeding through and clearing security screening by the Transportation Security

Administration ("TSA"), English arrived at his departure gate.  Id. ¶¶ 24, 30.  After

his flight was called for boarding, English handed his ticket to the gate agent who

scanned it and handed it back to him.  Id. ¶ 30.  As he advanced into the jet bridge

to board his flight, Defendants Tony Griffin ("Griffin") and Kayin Campbell

("Campbell"), two plain-clothed officers with the Clayton County Police

Department ("CCPD"), emerged from a bend in the bridge, flashed their badges,

---

[1] Because this case is before the Court on the pending motion to dismiss, the facts
are presented as alleged in the First Amended Complaint ("Am. Compl.") [Doc.
24].  Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019)
(citation omitted).  However, the Court does not state as facts the legal arguments
interspersed throughout the Amended Complaint.

and "began peppering Mr. English with questions about whether he was carrying any illegal drugs." Id. ¶¶ 31-33. English, a Black male, responded that he was not carrying any illegal drugs. Id. ¶¶ 12, 33. The officers listed a number of potential illegal substances, and English again denied being in possession of any of them. Id. ¶ 33.

Griffin and Campbell then instructed English to step to the side of the jet bridge and stood on both sides of him. Id. ¶¶ 35-36. Upon the request of one of the officers, English produced his identification and boarding pass. Id. ¶ 37. While holding English's identification and boarding pass, Griffin and Campbell continued to ask English questions about whether he was carrying any illegal drugs and began inquiring about his profession, his reasons for travel to Los Angeles, and how long he planned to stay there. Id. ¶ 38. One of the officers then stated that he wanted to search English's carry-on luggage, and English consented to the search. Id. ¶ 41. While one of the officers searched his carry-on luggage, the other officer continued to ask English questions and English's identification and boarding pass were returned to him. Id. ¶¶ 42-43. After English asked, "What exactly is going on here?", the officers returned English's luggage and told him he was free to leave. Id. ¶ 44. English felt that "he had no choice" but to consent to the search of

his luggage and that "[t]he entire experience was degrading and disturbing." Id.
¶¶ 41, 46.

**B.     The April 21, 2021, Incident**

On April 21, 2021, Plaintiff Eric André ("André") boarded a Delta Airlines
flight in Charleston, South Carolina, enroute to Los Angeles via a connecting flight
at the Atlanta Airport. Id. ¶ 47. André cleared TSA security in Charleston, arrived
in Atlanta, and spent time in the Delta Airlines lounge. Id. ¶¶ 48-49. André then
proceeded to his departure gate, had his ticket scanned by a Delta agent, and
advanced into the jet bridge tunnel. Id. ¶¶ 49-51. André, a Black male, was then
approached in the jet bridge by plain-clothed Defendants CCPD Officer Aimee
Branham ("Branham") and Clayton County District Attorney's Office ("CCDAO")
Investigator Michael Hooks ("Hooks"), who flashed their badges, obstructed
André's path into the airplane, and began questioning André about whether he was
carrying illegal drugs, which André denied. Id. ¶¶ 11, 51-54. Branham and Hooks
asked André to hand over his ticket and identification, which the officers
"recorded," and André was questioned about his travel plans and his reason for
flying. Id. ¶ 55. One officer told André that the questions were "protocol," and
that they were conducting "random" stops inside the airport. Id. ¶ 56. After
approximately five minutes, André was told that he was free to leave and board the

4

plane. Id. ¶ 58. André felt he had no choice but to comply with the officers' requests and found the entire experience "traumatizing, degrading, and humiliating." Id. ¶¶ 54-55, 59.

## C.   Clayton County's Airport Interdiction Unit

English and André allege that their incidents are not isolated but rather a part of a formal CCPD program at the Atlanta Airport, which the "Airport Interdiction Unit" operates. Id. ¶ 60-61. Pursuant to this program, CCPD officers, occasionally accompanied by CCDAO investigators, wait in jet bridges of departing flights and stop passengers attempting to board at "random" for "consensual" encounters to determine whether these passengers are carrying illegal drugs or large amounts of currency. Id. ¶¶ 62, 64. Plaintiffs characterize the program operated by the Airport Interdiction Unit as "coercive" because the passengers selected for questioning are stopped in "narrow, highly-restricted jet bridges" as they attempt to board their flights, surrounded by other passengers moving toward the entrance to the aircraft, and bombarded with questions they feel compelled to answer.[2] Id. ¶ 69.

---

[2] Plaintiffs describe the officers participating in the interdiction program as "armed," Id. ¶ 69, but neither English nor André allege that Griffin, Campbell, Branham, or Hooks were armed during their respective encounters.

After alleging that government inquiries have determined that TSA agents disproportionately profile persons of color, thereby putting law enforcement officials "on notice" that drug interdiction programs raise civil rights concerns, Plaintiffs assert that CCPD lacks any policies or practices that constrain officers' discretion when conducting their jet bridge interdiction, resulting in a disproportionate number of Black passengers and people of color being stopped for questioning. Id. ¶¶ 67-68, 74-77. Plaintiffs aver that, because Defendant Cameron Smith ("Smith"), a CCPD sergeant, regularly receives logs of passenger interdictions, he is aware of the racially discriminatory impact of CCPD's interdiction program. Id. ¶¶ 19, 81-82. Plaintiffs also allege that Clayton County was provided "express notice" of the unconstitutionality of its interdiction program in Noell v. Clayton Cnty., No. 1:15-CV-2404-AT, 2016 WL 11794207 (N.D. Ga Sept. 21, 2016). Id. ¶ 113.[3]

---

[3] In addition, Plaintiffs allege that CCPD's drug interdiction program is ineffective at finding illegal drugs (resulting in criminal charges filed against only two individuals out of 402 jet bridge stops in an eight-month period) but is "financially lucrative" based on the amount of cash seized as a result of the stops. Id. ¶¶ 84, 86. Only eight of the twenty-five individuals who were subject to civil asset forfeitures challenged those forfeitures in Court. Id. ¶ 87.

Plaintiffs aver that CCPD has engaged in impermissible intentional discrimination on the basis of race in deciding who its officers stop and question.

> From September 2020 through April 2021—a period that captures the stops of Plaintiffs Eric André and Clayton English—CCPD conducted 378 passenger interdictions in jet bridges where department records list the race of the passenger stopped. Of those, 56% of stopped passengers were Black. Given that only 8% of American airline passengers are Black (and given that the Atlanta Airport fairly represents that population), the probability of this happening randomly is staggering: significantly less than one in one hundred trillion.

Am. Compl ¶¶ 5, 81. Plaintiffs allege that CCPD targets passengers based on race due to a stereotype that "being Black is a proxy for drug trafficking," because "Black individuals are less likely to have bank accounts and therefore more likely to carry assets as cash," and because "Black individuals are, for good reason, more wary of engaging with the legal system to challenge a wrongful seizure." Id. ¶ 83.

**D.  Other Incidents**

Plaintiffs reference two other earlier incidents in their Amended Complaint which they consider a similar targeting of Black male passengers by the CCPD Airport Interdiction Program. The first incident involved Preston Lewis ("Lewis"), who was stopped on August 17, 2017, by two plain-clothed CCPD officers while he was boarding his connecting flight at the Atlanta Airport to San Francisco, California. Id. ¶ 106. The officers asked Lewis questions about whether he was carrying any illegal drugs and asked to search his bags, which Lewis consented to.

Id. ¶ 107.  The officers discovered $14,000 in currency that Lewis received from his job as a tree surgeon and from cashing an insurance settlement check.  Id. ¶ 108.  Despite Lewis offering the officers receipts for the majority of the cash, the officers escorted Lewis to a car and drove him to another location in the Atlanta Airport where his luggage was again searched, his phone scanned, and the money seized.  Id. ¶ 109.  Lewis was not charged with a crime and filed an action that resulted in the return of the cash seized by the officers.  Id. ¶¶ 110-11.

In April 2019, Jean Elie ("Elie"), was boarding a flight at the Atlanta Airport to Los Angeles, when he was stopped on the jet bridge by two plain-clothed officers, Hooks and Griffin.  Id. ¶¶ 93, 95-96.  Elie, the only Black person on the jet bridge, was told that "they needed to look through his carry-on bags" as part of a random stop.  Id. ¶¶ 95-97.  Elie "believed that if he declined the search, he would be detained and not allowed to board his flight home," and filmed the officers rifling through his bags on his cell phone camera.  Id. ¶¶ 98-99.  The officers asked Elie questions about when he bought his ticket, his reasons for traveling, and whether he was previously arrested, but Elie refused to answer any of the questions.  Id. ¶ 100.  Elie was permitted to leave once the officers finished their search of his bags.  Id.

### E.     The Amended Complaint

English and André contend that their constitutional rights were violated by Defendants in the incidents that occurred at the Atlanta Airport on October 30, 2020, and April 21, 2021, respectively.  Id. ¶ 9-10.  They raise the following causes of action: (1) Violation of the Fourth and Fourteenth Amendments against all Defendants for conducting an unreasonable seizure of both Plaintiffs on the jet bridge (Count One); (2) Violation of the Fourth and Fourteenth Amendments against Defendants Clayton County, Roberts, Griffin, Campbell, and Smith for the unreasonable search of English (Count Two); (3) Violation of the Equal Protection Clause of the Fourteenth Amendment against all Defendants based on race discrimination in the CCPD's Airport Interdiction Program (Count Three); and (4) Violation of 42 U.S.C. § 1981 against all Defendants based on race discrimination in the CCPD's Airport Interdiction Program (Count Four).  Id. ¶¶ 114-142.

## II.    LEGAL STANDARDS

### A.     Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed

for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual

allegations. Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and

"determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

**B.    42 U.S.C. § 1983 and Qualified Immunity**

"It is well established that [42 U.S.C. §] 1983 itself creates no substantive

rights; it merely provides a remedy for deprivations of federal rights established

elsewhere." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032

(11th Cir. 1987) (citing City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985)).  To

sustain a cause of action based on § 1983, a litigant must establish two elements:

(1) that he suffered a deprivation of a right, privilege, or immunity protected by the

U.S. Constitution or federal law, and (2) that the act or omission causing the

deprivation was committed by a person acting under color of state law.  Livadas v.

Bradshaw, 512 U.S. 107, 132 (1994); Arrington v. Cobb Cnty., 139 F.3d 865, 872

(11th Cir. 1998).  "[S]ection 1983 imposes liability only 'for violations of rights

protected by the Constitution, not for violations of duties of care arising out of tort

law.'" Wideman, 826 F.2d at 1032 (quoting Baker v. McCollan, 443 U.S. 137,

146 (1979)).  Accordingly, "[i]n any § 1983 action, a court must determine

'whether the Plaintiff has been deprived of a right secured by the Constitution and

laws of the United States.'" Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir.

2011) (quoting Baker, 443 U.S. at 146). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." Wideman, 826 F.2d at 1032.

To avoid individual liability in a claim under § 1983, law enforcement officers may invoke the defense of qualified immunity, which "offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To claim qualified immunity, a defendant must first show he or she was performing a discretionary function. Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).

> Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (citation omitted).

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Edwards v. Shanley,

12

666 F.3d 1289, 1294 (11th Cir. 2012) (quoting <u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." <u>Whittier</u>, 581 F.3d at 1308.

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'"  <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." <u>Jones v. Fransen</u>, 857 F.3d 843, 851 (11th Cir. 2017) (citing <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).  There are three methods to show that the government official had fair warning:

> First, the plaintiffs may show that a materially similar case has already been decided.  Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.  Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant state supreme court].

Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (quotation marks,

citations, and alterations omitted).

The first method "looks at the relevant case law at the time of the violation;

the right is clearly established if 'a concrete factual context [exists] so as to make it

obvious to a reasonable government actor that his actions violate federal law.'"

Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (alterations in

original) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)).

While the facts of the case need not be identical, "the unlawfulness of the conduct

must be apparent from pre-existing law." Coffin, 642 F.3d at 1013; see also

Gennusa v. Canova, 748 F.3d 1103, 1113 (11th Cir. 2014) (citation and internal

quotation marks omitted) ("We do not always require a case directly on point

before concluding that the law is clearly established, but existing precedent must

have placed the statutory or constitutional question beyond debate.").  "In other

words, immunity protects all but the plainly incompetent or those who knowingly

violate the law." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (citation and

internal quotation marks omitted).

The second and third methods, known as "obvious clarity" cases, exist when

"case law is not needed" to demonstrate the unlawfulness of the conduct or where

the existing case law is so obvious that "every objectively reasonable government

14

official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vineyard, 311 F.3d at 1351.  Such cases are rare.  See, e.g., Santamorena v. Ga. Military Coll., 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (noting that "these exceptional cases rarely arise").

## III.   DISCUSSION

### A.    The Fourth Amendment Claims

#### 1.    Plaintiffs Fail to State a Claim for a Fourth Amendment Violation Based Upon an Unlawful Seizure (Count One) Because English and André's Interactions With the Officers Were Voluntary Encounters.

Defendants contend that Plaintiffs were involved in nothing more than a consensual encounter, and thus cannot establish a violation of their constitutional rights.  Defs.' Mem. Of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Br.") [Doc. 25-1] at 9-10.  By contending that they were unlawfully seized, Plaintiffs principally rely on United States v. Berry, 670 F.2d 583, 591 (5th Cir. Unit B 1982)[4], which they argue "clearly establishes the Fourth Amendment violations

---

[4] A post-September 30, 1981 decision of a "Unit B" panel of the former Fifth Circuit serves as binding precedent in this Circuit.  In re Int'l Horizons, Inc., 689 F.2d 996, 1004 (11th Cir. 1982) (citations omitted).

here."  Pls.' Resp. in Opp'n. to Defs.' Mot. to Dismiss ("Pls.' Resp.") [Doc. 29] at 7.

In order to determine whether Plaintiffs' Fourth Amendment rights were infringed, the Court considers whether Plaintiffs were seized at any point during their encounters with the officers.  Corbitt v. Vickers, 929 F.3d 1304, 1313 (11th Cir. 2019).  The Eleventh Circuit has characterized three types of police-citizen encounters with varying degrees of Fourth Amendment scrutiny: "communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause."  United States v. Fields, 909 F.2d 470, 473 (11th Cir. 1990) (quoting Berry, 670 F.2d at 591); see also United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006) ("There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.").

"The first type of [police-citizen] encounter, often referred to as a consensual encounter, does not implicate the Fourth Amendment."  United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) (citation omitted).  Factors

16

relevant to an inquiry of whether routine police questioning evolves into a seizure

for Fourth Amendment purposes include the following:

> [W]hether a citizen's path is blocked or impeded; whether
> identification is retained; the suspect's age, education and intelligence;
> the length of the suspect's detention and questioning; the number of
> police officers present; the display of weapons; any physical touching
> of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (quoting United States v. De La Rosa, 922 F.2d 675, 678

(11th Cir. 1991)).  "We do not apply these factors rigidly, however, but rather use

them as relevant guidance, to be considered among other things."  Jordan, 635 F.3d

at 1186 (citation and quotation marks omitted).  In the context of an encounter at

an airport,

> [e]xamples of circumstances that might indicate a seizure, even where
> the person did not attempt to leave, would be the threatening presence
> of several officers, the display of a weapon by an officer, some physical
> touching of the person of the citizen, or the use of language or tone of
> voice indicating that compliance with the officer's request might be
> compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality opinion by

Stewart, J.).  In Mendenhall, a plurality of the Supreme Court held that a voluntary

encounter did not rise to the level of a seizure when officers, who were not wearing

any uniforms or displaying any weapons, approached a passenger on a public

concourse requesting to see her identification and ticket, and then asked her a few

questions.  446 U.S. at 555-556.

17

In <u>United States v. Jensen</u>, 689 F.2d 1361 (11th Cir. 1982), the Eleventh Circuit held that a voluntary encounter occurred when two Drug Enforcement Agency officers approached an individual who was sitting at an airport departure gate, the officers displayed credentials, asked to speak with the defendant, and proceeded to ask if he was carrying any narcotics or drugs. This "indicated no more than an interrogation as part of a more general inquiry into drug smuggling" which "did not bring the Fourth Amendment into play." <u>Id.</u> at 1363. The court noted that the officers never accused the defendant of carrying illegal drugs and the statements made by the officers "would not have indicated to a reasonable person that he had become the specific focus of an investigation or that failure to cooperate would lead only to formal detention." <u>Id.</u>

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." <u>United States v. Drayton</u>, 536 U.S. 194, 200 (2002); <u>see also</u> <u>United States v. Alvarez-Sanchez</u>, 774 F.2d 1036, 1040 (11th Cir. 1985) ("Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the [F]ourth [A]mendment.").

In evaluating whether an encounter with law enforcement officers is a voluntary encounter or a seizure warranting Fourth Amendment protection, the Court must consider all the circumstances surrounding the encounter and determine if "a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." Fla. v. Bostick, 501 U.S. 429, 438 (1991). This "applies equally to police encounters that take place on trains, planes, and city streets." Id. (emphasis added). "[T]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." Id. at 431. "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." Id. at 437.

The reasonable person standard requires courts to disregard any subjective beliefs that an individual has and instead focus the inquiry on whether "a reasonable person would feel free to terminate the encounter." United States v. Knights, 989 F.3d 1281, 1286 (11th Cir. 2021) (citations omitted) (noting that the court must "imagine how an objective, reasonable, and innocent person would feel,

19

not how the particular suspect felt.").  "This 'reasonable person' standard also

ensures that the scope of Fourth Amendment protection does not vary with the

state of mind of the particular individual being approached."  Michigan v.

Chesternut, 486 U.S. 567, 574 (1988); see also United States v. Hunter, 798 F.

App'x 511, 517 (11th Cir. 2020) ("[W]e decline to substitute Hunter's specific

viewpoint for that of a reasonable person[.]").

Defendants do not dispute that the officers had no reasonable suspicion of

criminal conduct prior to approaching Plaintiffs.  At issue here is whether Plaintiffs

have plausibly alleged that their interactions with the officers constituted a seizure

requiring reasonable suspicion, or voluntary interactions not implicating the Fourth

Amendment.

> **a.    Based on English's allegations, he was not coerced or
> detained so as to implicate the protections of the
> Fourth Amendment.**

Accepting English's allegations as true, Griffin and Campbell emerged from

a bend in a tunnel, "cut off his path" on a narrow jet bridge, and began "peppering"

English with questions about whether he was transporting any drugs.  Am. Compl.

¶¶ 31-33.  There is no allegation that these officers were armed, only that they

displayed their badges.  Id. ¶¶ 32-33.[5]  According to English, the officers

"instructed" him to move to the side of the jet bridge and the two officers were

standing directly to the left and right of English.  Id. ¶¶ 35-36.  The officers asked

English to hand over his identification and boarding pass and then, while holding

English's identification and boarding pass, the officers continued asking him

questions about his reason for traveling to Los Angeles and his profession.  Id.

¶ 38.  After additional questioning and upon being given consent to search his

luggage, the officers returned his identification and boarding pass and English was

free to leave.  Id. ¶¶ 41-44.

Based on the allegations of the Amended Complaint construed in the light

most favorable to English, the interaction between English and the CCPD officers

was consensual.  Griffin and Campbell did not raise their voices or make physical

contact with English, no weapons were displayed nor threats made by the officers,

they asked for consent to search English's carry-on bag, the entire encounter was

brief and took place on the jet bridge in front of other passengers, and the officers

---

[5] Even if the officers were armed, "because it is well known that most officers are armed, the presence of a holstered firearm is unlikely to be coercive absent active brandishing of the weapon." Drayton, 536 U.S. at 195.

did not move away from English while they were holding his boarding pass and

identification.  On similar facts, in <u>Drayton</u>, the Supreme Court ruled that officers

who entered a crowded bus and asked questions of passengers, including a request

to search their bags, had engaged in a voluntary interaction outside of Fourth

Amendment protections because "[t]here was no application of force, no

intimidating movement, no overwhelming show of force, no brandishing weapons,

no blocking of exits, no threat, no command, not even an authoritative tone of

voice."  536 U.S. at 204.  "The Court has dealt with similar encounters in airports

and has found them to be 'the sort of consensual encounters that implicate no

Fourth Amendment interest.'"  <u>Bostick</u>, 501 U.S. at 434 (internal punctuation

omitted) (citing <u>Fla. v. Rodriguez</u>, 469 U.S. 1, 5-6 (1984)).

 Nothing in the <u>Berry</u> opinion, relied upon so heavily by Plaintiffs, changes

this result.  "As a broad gauge for determining when an airport stop becomes so

intrusive" that it qualifies as a seizure, the <u>Berry</u> court adopted the test "proposed

by Justice Stewart in <u>Mendenhall</u>: a seizure has occurred if 'in view of all the

circumstances surrounding the incident, a reasonable person would have believed

that he was not free to leave.'"  <u>Berry</u>, 670 F.2d at 595 (quoting <u>Mendenhall</u>, 446

U.S. at 554).  <u>Berry</u> listed several factors "that might be relevant to a court's

inquiry," including blocking an individual's path, retaining an individual's ticket

"for more than a minimum amount of time," and statements made by officers that

the passenger who is questioned is a suspect in smuggling illegal drugs. Id. at 597.

In Berry, the court found that a seizure occurred not at the initial encounter but

only after the defendant first gave a false name and claimed he was traveling alone,

then produced a driver's license with a name the DEA agent recognized as a

suspected drug smuggler, and admitted he was traveling with another companion

Id. at 589, 603. None of those facts come close to approaching the alleged facts in

this case where Plaintiffs were not suspects and did not misrepresent their

identities or their travel plans.

English argues that his ability to move towards the door of the airplane

somehow was compromised because the officers blocked his path by standing on

both his left and right sides. Pls.' Resp. at 10; Am. Compl. ¶ 36. However, an

officer's mere positioning between a passenger and an exit does not indicate that

the passenger "could not exit[.]" Drayton, 536 U.S. at 205 (citing I.N.S. v.

Delgado, 466 U.S. 210, 219 (1984) (holding that no seizure occurred when agents

were posted at exits to ensure every employee of the factory would be

questioned)). In Delgado, the Court held that mere questioning "should have given

respondents no reason to believe that they would be detained if they gave truthful

answers to the questions put to them or if they simply refused to answer." 466

23

U.S. at 218.  Similarly, in Berry, the court found no evidence of coercion when agents stopped Berry's progress toward a taxi stand.  670 F.2d at 603 ("The agents merely identified themselves and asked if they could talk with Berry."); see also Bostick, 501 U.S. at 435 (holding that officers who questioned the plaintiff "in the cramped confines of a bus" did not result in a seizure merely because "freedom of movement was restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus.").

The allegations that the jet bridge was narrow and that officers stood on both sides of English did not elevate the interaction into a seizure.  Delgado, 466 U.S. at 220-21; Drayton, 536 U.S. at 205.

> The manner in which respondents were questioned, given its obvious purpose, could hardly result in a reasonable fear that respondents were not free to continue working or to move about the factory.  Respondents may only litigate what happened to them, and our review of their description of the encounters with the INS agents satisfies us that the encounters were classic consensual encounters rather than Fourth Amendment seizures.

Delgado, 466 U.S. at 220-21 (holding that when "nothing more occurred than a question was put to them[,]" no seizure occurred).   In addition, although the close physical proximity of the officers to English is a single relevant factor to consider in deciding whether a seizure occurred, it is not controlling because the remaining factors support the determination that English was able to leave.  See Bostick, 501

24

U.S. 429, 439 ("The cramped confines of a bus are <u>one</u> relevant factor that should be considered in evaluating whether a passenger's consent is voluntary.") (emphasis added).

Plaintiffs also contend that the officers' holding onto English's identification during questioning contributes to his being seized. Pls.' Resp. at 10. But this argument is unavailing. In <u>United States v. Armstrong</u>, 722 F.2d 681 (11th Cir. 1984), the Eleventh Circuit concluded that when police officers approached individuals in the public concourse of an airport and asked them questions, while briefly retaining their identifications for a minimal amount of time, this did not result in the type of police-citizen encounter that would invoke any Fourth Amendment safeguards. 722 F.2d 681, 685 (11th. Cir. 1984) (contrasting the factual circumstances of that case to instances where an officer's conduct was coercive, such as "blocking an individual's path or otherwise intercepting him to prevent his progress," or "retaining an individual's ticket for more than a minimal amount of time.").[6] The same result was reached in <u>United States v. Jensen</u>:

---

[6] In <u>Armstrong</u>, the defendant argued that retention of the ticket and identification was similar to the facts in <u>United States v. Elsoffer</u>, 671 F.2d 1294 (11th Cir. 1982), a case also relied upon by Plaintiffs. <u>Id.</u>, 722 F.2d at 685; <u>see</u> Pl's Resp. at 8. However, the <u>Armstrong</u> court rejected the analogy. "This case is clearly different than <u>Elsoffer</u> since nothing in this case indicates that Detective Glover did not return the items to Mr. Armstrong after only a minimal amount of time had elapsed." <u>Armstrong</u>, 722 F.2d at 685. Like in <u>Armstrong</u>, the allegations in this

> [The DEA agent's] request for identification, identification of himself, and question concerning whether Jensen was carrying drugs indicated no more than an interrogation as part of a more general inquiry into drug smuggling. [The DEA agent] never accused Jensen of carrying drugs and never even stated that he suspected Jensen of carrying drugs. The statements would not have indicated to a reasonable person that he had become the specific focus of an investigation or that failure to cooperate would lead only to formal detention.

Jensen, 689 F.2d at 1363.[7]

Finally, the fact that English was asked several times by officers if he had

illegal narcotics did not turn the voluntary encounter into a seizure. There is no

---

case are that English's identification and boarding pass were returned to him after no more than a minimal amount of time had passed.

[7] To the extent that the corresponding request to search English's hand luggage is argued to also be part of the seizure, Jensen addressed this very issue and held that such a request would not have indicated to a reasonable person that he was not free to leave.

> Nor do we believe, as Jensen charges, that a reasonable person in his place, after [the DEA agent] had asked for consent to a search following Jensen's denial that he was smuggling drugs, would have believed that [the DEA agent] thought he was lying and so would not have felt free to leave. [The DEA agent] never intimated that he thought Jensen was lying. His request would merely have appeared to a reasonable person to have been an attempt to obtain confirmation of denials of drug-smuggling activity, not an accusation that the denials were lies, and hardly would have indicated that that person no longer was free to leave if he wished.

Jensen, 689 F.2d at 1363-64 (emphasis added).

allegation that English was coerced, the questions were limited in scope and time,

English was not escorted to another location, and he was able to board his flight

prior to its departure.[8]  Similarly, in Mendenhall,

> the agents wore no uniforms and displayed no weapons.  They did not
> summon the respondent to their presence, but instead approached her
> and identified themselves as federal agents.  They requested, but did
> not demand to see the respondent's identification and ticket.  Such
> conduct without more, did not amount to an intrusion upon any
> constitutionally protected interest. The respondent was not seized
> simply by reason of the fact that the agents approached her, asked her
> if she would show them her ticket and identification, and posed to her
> a few questions.  Nor was it enough to establish a seizure that the person
> asking the questions was a law enforcement official.

446 U.S. at 555.  In fact, the Court in Mendenhall, found there was no seizure even

after the passenger consented to accompanying agents to their office.  Id. at 560.

In this case, English was instructed to move to the side of the jet bridge as he

answered questions posed by the officers.  Am. Compl. ¶ 35.  There is no assertion

that English was removed from the jet bridge away from the other passengers in

line or even that the side of the jet bridge was a sizeable distance away from his

previous position.  Even as English was on the side of the jet bridge, he avers that

passengers "squeezed and maneuvered around" him.  Id. ¶ 39.  The allegations in

---

[8] English was able to complete his boarding and embark the plane.  Am. Compl.
¶ 44.

the Amended Complaint also place English in view of the other passengers, because he alleges that they were gawking at the interaction. Id. ¶ 39. "[B]ecause many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." Drayton, 536 U.S. at 204.

Accordingly, accepting Plaintiffs' allegations as true as well as all reasonable inferences drawn from those allegations, the interaction between English and CCPD officers Griffin and Campbell did not involve any coercion or detention and, therefore, English has failed to sufficiently allege an unlawful seizure in violation of the Fourth Amendment.

> **b.** **Based on André's allegations, he was not coerced or detained so as to implicate the protections of the Fourth Amendment.**

Accepting André's allegations as true, he had a five-minute-long encounter with Branham and Hooks, who were wearing badges but were not armed. Am. Compl. ¶¶ 52, 58. Branham and Hooks asked André to hand over his ticket and identification and posed a "series of questions . . . in quick succession" about whether he was carrying illicit drugs and his travel plans. Id. ¶¶ 53, 55. Plaintiffs do not allege that Branham and Hooks raised their voices or made any physical contact with André.

Although André does not allege that either Branham or Hooks commanded him to take any specific actions, he alleges that he felt like he had to comply and "did not believe he could say no" to their request to hand over his ticket and identification. Id. ¶¶ 54-55. André's subjective beliefs about not being free to terminate the encounter are irrelevant because, as previously stated, the Court must focus on whether a reasonable person would feel free to terminate the encounter. Knights, 989 F.3d at 1286.

The questioning and interaction between Branham and Hooks and André was even less obtrusive than that experienced by English, and this Court has concluded that English failed to state a claim for an illegal seizure. André's entire voluntary encounter took no more than five minutes, which is consistent with those cases holding that similar encounters did not develop into a seizure. See Armstrong, 722 F.2d at 685 (concluding there was no seizure where the officer returned the passenger's ticket and identification after a minimal amount of time for questioning); United States v. Puglisi, 723 F.2d 779, 783-84 (11th Cir. 1984) (determining that an encounter that took approximately four minutes was voluntary despite an officer leading a passenger to a different area, frisking him, and asking him questions about possessing drugs). This is not a case where additional factors such as escorting a passenger to a separate police-designated area or considering a

29

passenger as a suspected drug smuggler transformed a voluntary encounter into a seizure.  See Fla. v. Royer, 460 U.S. 491, 501-07 (1983) (plurality opinion by White, J.) (distinguishing a consensual encounter consisting of a request for a passenger's ticket and identification from one where the passenger is told he is suspected of transporting narcotics and escorted to a police room while the ticket and identification are retained).

André voluntarily gave the officers his identification and boarding pass, the boarding pass and identification remained in André's view the entire time, the officers did not take André's documents elsewhere down the jet bridge, and the officers did not ask André to accompany them to a different location.  See Drayton, 536 U.S. at 204 (holding that a voluntary encounter occurs when there is "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.").  The fact that an encounter happened within a narrow navigable space did not transform "standard police questioning into an illegal seizure." Bostick, 501 U.S. at 439-440.  "[B]ecause many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." Drayton, 536 U.S. at 204.  Additionally, mere positioning

of an officer between the subject of the encounter and the exit does not "intimidate passengers"; instead, something more is needed to indicate that people could not exit. Id. at 205.

Accordingly, accepting Plaintiffs' allegations as true as well as all reasonable inferences drawn from those allegations, the interaction between André, CCPD Officer Branham, and CCDAO Investigator Hooks did not involve any coercion or detention and, therefore, André has failed to sufficiently allege an unlawful seizure in violation of the Fourth Amendment.

> **2.   English Fails to State a Claim for a Fourth Amendment Violation Based Upon an Unlawful Search (Count Two) Because the Alleged Facts Show That the Search Was Voluntary and the Product of a Consensual Encounter.**

In Count Two, English alleges that Griffin and Campbell unlawfully searched his luggage, that Smith as a supervisor was on notice of CCPD's practice of unconstitutional searches, and that Clayton County and Kevin Roberts, the Chief of CCPD, operated a program that permitted the illegal searches. Am. Compl. ¶¶ 14, 122-27. In their motion to dismiss, Defendants argue that English consented to a search of his luggage which defeats Plaintiffs' Fourth Amendment claim based on an allegedly unreasonable search. Defs.' Br. at 10. Plaintiffs, in response, argue that English's consent to search was coerced because Griffin and Campbell asked for permission to search English's bags only after they instructed him to

31

move to the side of the jet bridge and stood on either side of him, while they held English's identification and boarding pass, and asked him questions about whether he was carrying narcotics.  Pls.' Resp. at 10-11.

After requesting English's travel documents, one officer "stated that he wanted to search" English's luggage, and English "acquiesced[.]"  Am. Compl. ¶ 41.  An officer began searching his luggage, while the other officer continued asking English questions.  Id. ¶ 42.  They then returned to English his identification and boarding pass.  Id. ¶ 43.  After English asked, "[w]hat exactly is going on here?", the officers returned his luggage and told him that he was free to leave.  Id. ¶ 44.

The Fourth Amendment of the United States Constitution protects an individual's right to be free form unreasonable searches.  U.S. Const. amend. IV. "While the Fourth Amendment prohibits unreasonable searches, a search is reasonable and does not require a warrant if law enforcement obtains voluntary consent."  United States v. Morales, 893 F.3d 1360, 1367 (11th Cir. 2018) (internal quotation marks and alteration omitted).  To be voluntary, the consent must be "the product of an essentially free and unconstrained choice."  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (internal quotation marks omitted).  A court should consider the totality of the circumstances, including the

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of a defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

United States v. Spivey, 861 F.3d 1207 at 1213 (citation and internal quotation marks omitted).

The Court previously determined that, based on the facts as alleged in the Amended Complaint, the encounter between the CCPD officers and English was consensual and not coercive. When one of the officers indicated to English a desire to search his luggage, English was under no obligation to consent to such a search but did so. English was not physically restrained, he was not threatened by the officers, and English was competent to offer consent. Although there is no allegation that English was informed of his right to refuse consent, the officers were not required to inform him of his right. Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973) ("[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent.").

Plaintiffs cite U.S. v. Chemaly, 741 F. 2d 1346 (11th Cir. 1984), and United States v. Bacca-Beltran, 741 F.2d 1361 (11th Cir. 1984) in support of their contention that the search of English's luggage was involuntary. Pls.' Resp. at 11.

33

Those cases are inapposite.  <u>Chemaly</u> was a border search case in which a

confidential informant advised the DEA that the defendant would be taking

$500,000 onto a departing airplane for the purchase of cocaine.  <u>Chemaly</u>, 741

F.2d at 1348.  Although Chemaly agreed to a search of his briefcase which

contained a large amount of currency, the Eleventh Circuit found that consent was

not voluntary because the defendant was a suspect and his treatment by the officers

would lead a reasonable person to believe that a failure to cooperate would lead to

a formal detention.  <u>Id.</u> at 1353.  In <u>Bacca-Beltran</u>, another border search case, the

court found a search to be involuntary based upon the controlling precedent of

<u>Chemaly</u>.  741 F.2d at 1362-63.  In this case, there are no allegations which

indicate that English was a suspected drug smuggler but instead was asked generic

questions about whether he was carrying any illegal drugs.  As previously

discussed, English's ticket and identification was retained for a minimal amount of

time.  This case is more analogous to <u>Jensen</u>:

> Here, however, [the DEA agent's] request for identification,
> identification of himself, and question concerning whether Jensen was
> carrying drugs indicated no more than an interrogation as part of a more
> general inquiry into drug smuggling. [the DEA agent] never accused
> Jensen of carrying drugs and never even stated that he suspected Jensen
> of carrying drugs. The statements would not have indicated to a
> reasonable person that he had become the specific focus of an
> investigation or that failure to cooperate would lead only to formal
> detention.  Nor do we believe, as Jensen charges, that a reasonable
> person in his place, after [the DEA agent] had asked for consent to a

34

search following Jensen's denial that he was smuggling drugs, would have believed that [the DEA agent] thought he was lying and so would not have felt free to leave. [The DEA agent] never intimated that he thought Jensen was lying. His request would merely have appeared to a reasonable person to have been an attempt to obtain confirmation of denials of drug-smuggling activity, not an accusation that the denials were lies, and hardly would have indicated that that person no longer was free to leave if he wished.

Jensen, 689 F.2d at 1363-64 (footnote omitted).

Accordingly, accepting Plaintiffs' allegations as true as well as all reasonable inferences drawn from those allegations, English has failed to sufficiently allege an unlawful search in violation of the Fourth Amendment.

### B. The Equal Protection Claim

In Count Three of the Amended Complaint, Plaintiffs allege that their equal protection rights were violated by Defendants through the implementation of CCPD's Airport Interdiction Program which they claim uses race to target airline passengers "for interrogations, seizures, and searches." Am. Compl. ¶¶ 130-31. Plaintiffs additionally allege that the program was operated with the knowledge that it discriminated against Plaintiffs and that Roberts and CCPD were deliberately indifferent to Plaintiffs' constitutional rights. Id. ¶¶ 132-33.

In their motion to dismiss, Defendants argue that Plaintiffs' equal protection claim fails as a matter of law because the Amended Complaint "does not allege any facts that show that other similarly situated individuals received more

favorable or different treatment than them." Defs.' Br. at 12.  In addition,

Defendants assert that the Airport Interdiction Program operates at the Atlanta

Airport for a legitimate, non-discriminatory reason; namely, "combatting drug

trafficking" to and from certain flights. Id. at 13.  In response, Plaintiffs contend

that they have alleged that the Airport Interdiction Program has both a

discriminatory effect and purpose by disproportionately targeting Black passengers

for interdiction. Pls.' Resp. at 13-16.  Plaintiffs rely heavily on data showing that,

for an eight-month period that included the encounters with Plaintiffs, out of 378

jet bridge encounters that recorded the passenger's race, 56% of the passengers

stopped were Black and only 32% were White. Id. at 14.  Plaintiffs argue that this

is evidence of a discriminatory effect because only 8% of domestic air travelers are

Black. Id.  Plaintiffs also allege that the first-hand accounts of André and Elie

support this claim. Id. at 15.

The Equal Protection Clause of the Fourteenth Amendment "prohibits

selective enforcement of the law based on considerations such as race." Whren v.

United States, 517 U.S. 806, 813 (1996).  To prevail on such a claim, a plaintiff

must demonstrate that the enforcement of the law had a discriminatory effect and

was motivated by a discriminatory purpose. See United States v. Armstrong, 517

U.S. 456, 465 (1996) (applying the equal protection standard to a selective

36

prosecution claim).  To establish a discriminatory effect based on race, a plaintiff must show that similarly situated individuals of a different race did not receive the same treatment by law enforcement, and "[a]bsent some evidence of racially disproportionate arrests compared to the actual incidence of violations by race, there is no basis for inferring selective law enforcement." Swint v. City of Wadley, 51 F.3d 988, 1000 (11th Cir. 1995); see also B.T. by & through Jackson v. Battle, No. 21-10318, 2021 WL 4147087, at *3 (11th Cir. Sept. 13, 2021) (citation omitted) ("To make this showing, [a plaintiff] must demonstrate that [the defendants] treated similarly situated persons disparately and produce evidence that [the defendants'] actions 'were motivated by race.'").

### 1.   Plaintiffs fail to allege a similarly situated comparator.

The first problem that Plaintiffs have in supporting their claim that Defendants violated their equal protection rights is a failure to identify a similarly situated individual of a different race who was treated differently by Defendants in similar circumstances. United States v. Brantley, 803 F.3d 1265, 1271 (11th Cir. 2015) (defining a similarly situated comparator in a selective prosecution context as "one who engaged in the same type of conduct" and "related in the same way to the Government's enforcement priorities"); see also Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006) (requiring that comparators be "*prima facie*

identical in all relevant respects"); 625 Fusion, LLC v. City of Fort Lauderdale,

595 F. Supp. 3d 1228, 1257 (S.D. Fla. 2022) (citing cases where the Eleventh

Circuit has held that a selective-enforcement claim cannot survive without a

similarly situated comparator). "Without factual allegations establishing [a

similarly situated comparator] Plaintiff cannot establish a sufficient claim of an

Equal Protection violation to satisfy his burden." Smith v. Barrow, No. 5:13-CV-

179-MTT-MSH, 2013 WL 6800751, at *3 (M.D. Ga. Dec. 20, 2013), R&R

adopted, No. 5:13-CV-179 MTT, 2014 WL 519292 (M.D. Ga. Feb. 10, 2014); see

also Whitaker v. Bd. of Regents of Univ. Sys. of Georgia, No. 20-13618, 2021 WL

4168151, at *5 (11th Cir. Sept. 14, 2021) (affirming motion to dismiss when

"[p]laintiff identified no valid comparator and alleged no other specific facts that

would raise his equal protection claim above the speculative level.").

Plaintiffs do not allege that CCPD's Airport Interdiction Program occurs

throughout the Atlanta Airport.  In fact, the interdictions mentioned in the

Amended Complaint all occurred during the boarding process of flights from

Atlanta to California.  Am. Compl. ¶¶ 9 (indicating that Plaintiffs were flying to

Los Angeles, California), 95 (indicating that Elie was flying to Los Angeles,

California), 106 (indicating that Lewis was flying to San Francisco, California).

So, taking as true Plaintiffs' allegation that the 8% figure representing the total

38

number of Black domestic air travelers corresponds to the total number of Black air travelers at the Atlanta Airport, and that 56% of the passengers questioned as part the CCPD's Airport Interdiction Program (over the eight-month time period) were Black passengers, this does not begin to state a claim for selective enforcement based on race. Plaintiffs fail to allege (1) the racial breakdown of passengers boarding unspecified flights in which the Airport Interdiction Program operated, or (2) the racial breakdown of passengers from those flights that had encounters with the Airport Interdiction Unit. Just because there are more White than Black passengers who travel through the Atlanta Airport and more Black than White passengers who were approached by officers as part of the Airport Interdiction Program, these two facts alone do not raise an equal protection claim. The failure to allege the Airport Interdiction Program's demographics precludes an inference that there is a discriminatory effect based only on the fact that more Black passengers than White passengers are approached for questioning in an eight-month time period. Indeed, there is not one allegation in the Amended Complaint that references a similarly situated White comparator to Plaintiffs.

**2.     Plaintiffs' statistics do not plausibly allege a discriminatory effect.**

Plaintiffs focus on the number of Black passengers identified as participants in the Airport Interdiction Program over an eight-month period and conclude that

39

there is a discriminatory effect by virtue of the fact that a larger percentage of White passengers travel through the Atlanta Airport. Pls.' Resp. at 14-15. This is a conclusory assertion not accompanied by any allegation in the Amended Complaint that the same or at least similar percentages of White travelers at the Atlanta Airport are also boarding flights that were subject to CCPD's Airport Interdiction Program. In Jordan, the Eleventh Circuit held that data that only showed the racial makeup of those prosecuted for a crime was not probative of discriminatory effect because the data did not show the specific criminal histories of other similarly situated defendants. 635 F.3d at 1188-1189. Similarly, without any allegations about how those subject to CCPD's Airport Interdiction Program are similarly situated to White travelers generally in the Atlanta Airport, the Court cannot infer that Plaintiffs' data alone sufficiently alleges that the Program has a discriminatory effect.[9]

> [S]tatistics from the Federal Public Defender's office in Miami say nothing about whether the government declined to prosecute similarly

---

[9] The two anecdotal references in the Complaint to André not seeing any other Black passengers boarding with him on the priority boarding line and Elie seeing no other Black passengers on the jet bridge do not alter this conclusion. Am. Compl. ¶¶ 50-51, 95. "We are unable to conclude, on the basis of these few instances of discipline, that the [] rule has a harsher effect on blacks than whites. Such small numbers are insufficient to support any conclusion as to whether the rule has a discriminatory effect." Robinson v. City of Dallas, 514 F.2d 1271, 1273 (5th Cir. 1975).

situated non-minority individuals in reverse stash house stings. Furthermore, the statistics from the Federal Public Defender's Miami office cover 25 of the 60 stash house cases that office handled within that district. Even if those 25 cases represent every reverse stash house sting out of the 60 cases, these statistics do not include similar cases in the district *not* handled by the Federal Public Defender's Miami office—they represent only a "fraction of the total number of prosecutions," as the government puts it. <u>And even if they did represent every similar case in the district, the statistics would still tell us nothing about similarly situated non-minority individuals. Simply put, telling the court how many minorities have been prosecuted does nothing to prove how many non-minorities have not been.</u>

<u>United States v. Cannon</u>, 987 F.3d 924, 938-39 (11th Cir. 2021) (emphasis added).

Similarly to the plaintiffs in <u>Cannon</u>, Plaintiffs here do not allege that CCPD's Airport Interdiction Program targets Black people to the exclusion of similarly situated passengers, nor do the statistics establish any facts about a similarly situated White traveler who was not subject to a voluntary encounter. <u>Id.</u> at 937-938 ("[S]tatistical evidence fails to establish discriminatory effect because it does not demonstrate that similarly situated defendants of other races could have been prosecuted for the same offenses but were not."). In addition, there is no allegation that the data from the particular eight-month period referenced by Plaintiffs has any statistical significance based on the racial composition of passengers traveling on the flights subject to CCPD's Airport Interdiction Program or that this Court can extrapolate this data as representative of the history of CCPD's Airport Interdiction Program. In <u>Castaneda v. Partida</u>, 430 U.S. 482, 495 (1977), a case

relied upon by Plaintiffs, the Court examined statistically significant data over an

eleven-year period.

> [P]laintiffs' statistical evidence, which is a generous way of classifying
> the demographic information plaintiffs provide, is insufficient to state
> an Equal Protection Clause claim. This is because the plaintiffs'
> complaint has no appropriate basis for comparison. For example, the
> information sheds no light on the practices of the individual deputies
> and how often they stop black [passengers] versus nonblack
> [passengers or passengers] of other races or ethnicities . . . In short, the
> demographic data does not address the practices of [the officers] to
> suggest that [André or English's] race motivated defendants to act the
> way they did on the morning in question.

Handy v. Fisher, No. 18-CV-00789-RBJ-SKC, 2019 WL 1375677, at *4 (D. Colo.

Mar. 27, 2019). "Such a small statistical sample carries little or no probative force

to show discrimination." Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir.

1991).

### 3.    Plaintiffs fail to plausibly allege a discriminatory purpose.

Plaintiffs' equal protection claim fails for failure to plausibly allege both a

similarly situated comparator and a discriminatory effect but, even if it sufficiently

alleged both, there is also no plausible allegation that Defendants purposefully

discriminated against them. "Disproportionate impact is not irrelevant, but it is not

the sole touchstone of an invidious racial discrimination forbidden by the

Constitution." Washington v. Davis, 426 U.S. 229, 242 (1976). "Proof of racially

discriminatory intent or purpose is required to show a violation of the Equal

Protection Clause." <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429

U.S. 252, 265 (1977).

Plaintiffs argue that the statistical data establishes a clear pattern of disparate

impact which can "suffice to establish discriminatory purpose[.]" Pls.' Resp. at 16.

Plaintiffs alternatively argue that because CCPD "knew of the jet bridge program's

discriminatory impact" that the continuation of the practice indicates their usage of

race as a motivating factor. Pls.' Resp. at 16-17.

> Although statistical evidence can be used to show selective law
> enforcement practices, <u>such evidence 'alone is rarely enough to show
> discriminatory purpose.'</u> The reason is that, to prove an Equal
> Protection Clause claim, a plaintiff 'must prove that the decisionmakers
> in *his* case acted with discriminatory purpose.' 'Cases where statistical
> evidence tend to show intent to discriminate are rare and accepted only
> in certain limited contexts.' 'Generally, statistical data is helpful only
> where there is an appropriate basis for comparison.'

<u>Thomas v. City of Aurora</u>, No. 20-CV-03308-LTB-NYW, 2021 WL 5810742, at

*11 (D. Colo. Dec. 7, 2021) (citations omitted) (emphasis added).

Plaintiffs rely upon CCPD supervisors' receipt of weekly logs[10] that detail

the stops initiated by CCPD's Interdiction Program and the number of Black

passengers that were the subject of the interdiction for an eight-month period,

---

[10] The alleged logs at issue record at least flight information, dates of birth, race,
and gender. Am. Compl. ¶ 81.

which they contend put CCPD on notice that the program operated on a racially

discriminatory fashion.  Pls.' Resp. at 16-17; Am. Compl. ¶¶ 19, 81-82.  There are

no allegations that Defendants made any specific decision based on the race of any

passengers.  And racial disparity alone is not sufficient to establish a

discriminatory purpose absent a "stark" pattern.  McCleskey v. Kemp, 481 U.S.

279, 293 (1987) (citing Arlington Heights, 429 U.S. at 266).  But, as previously

discussed, the lack of baseline information about the total number of passengers

subject to the interdiction program belies any significance that Plaintiffs attempt to

attach to the weekly logs.

   Aside from Plaintiffs alleging that Defendants continued the interdiction

program despite knowledge of the alleged disparity in the weekly logs, there are no

allegations that CCPD supervisors directed their officers to target passengers for

interdiction based on their race.

> [D]iscriminatory intent could be established through such evidentiary
> factors as substantial disparate impact, a history of discriminatory
> official actions, procedural and substantive departures from the norms
> generally followed by the decision-maker, and the legislative or
> administrative history of the decision.

Drayton v. McIntosh Cnty., No. CV 216-053, 2017 WL 11717727, at *10 (S.D.

Ga. Oct. 30, 2017) (citing Arlington Heights, 429 U.S. at 264-65).  None of these

factors have been alleged in this case.

Because Plaintiffs have failed to identify a comparator, sufficiently allege a discriminatory impact, or sufficiently allege a discriminatory purpose, Plaintiffs have failed to allege a plausible constitutional violation for selective enforcement in violation of the Equal Protection Clause.

### C.    The § 1981 Claim (Count Four).

In Count Four of the Amended Complaint, Plaintiffs allege that CCPD's Airport Interdiction Program deprives Black passengers the "full and equal benefit" of the law, in violation of 42 U.S.C. § 1981.  Am. Compl. ¶¶ 138-41. Plaintiffs allege that CCPD's Airport Interdiction Program is a longstanding custom or practice that operates in violation of the Fourth and Fourteenth Amendments.  Pl.'s Resp. at 1, 19; Am. Compl. ¶ 141 ("The violations of Plaintiffs' rights under § 1981 were caused by longstanding CCPD policies and customs in enforcing the jet bridge interdiction program.  Those policies and customs permitted and encouraged officers to use race when deciding which passengers to target, as previously described.").

The elements of a claim under § 1981 are: "(1) That plaintiff is a member of a racial minority; (2) An intent to discriminate on the basis of race by the defendant; and (3) That the discrimination concerned an 'enumerated activity' (i.e., one of those activities, or rights, directly or indirectly enumerated in the statute)."

Baker v. McDonald's Corp., 686 F. Supp. 1474, 1481 (S.D. Fla. 1987), aff'd, 865
F.2d 1272 (11th Cir. 1988).  The Supreme Court has held that "the express cause
of action for damages created by [42 U.S.C.] § 1983 constitutes the exclusive
federal remedy for violation of the rights guaranteed in § 1981 by state
governmental units." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989);
see also Butts v. County of Volusia, 222 F.3d 891, 894-95 (11th Cir. 2000)
(applying Jett to hold that § 1981 does not provide a cause of action separate from
§ 1983 against state actors).  Plaintiffs concede that they brought this claim under
42 U.S.C. § 1983 "for violation of the rights created by § 1981." Pls.' Resp. at 24.

      "Under section 1983, a local government is responsible for an injury
inflicted by its employee only when the injury is inflicted by the 'execution of [the]
government's policy or custom, whether made by its lawmakers or by those whose
edicts or acts may fairly be said to represent official policy.'" Holmes v. City of
Ft. Pierce, No. 20-13170, 2022 WL 247976, at *4 (11th Cir. Jan. 27, 2022)
(quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  A plaintiff
"has two methods by which to establish a county's policy: identify either (1) an
officially promulgated county policy or (2) an unofficial custom or practice of the
county shown through the repeated acts of a final policymaker for the county."

Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Monell,

436 U.S. at 690-91).

To succeed on a Monell claim, Plaintiff must first identify a valid underlying

constitutional violation.  Absent a violation, the Court need not address whether

liability extends to the county.  See Knight ex rel. Kerr v. Miami-Dade Cnty., 856

F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or

supervisory liability when there is no underlying constitutional violation.");

Garczynski v. Bradshaw, 573 F.3d 1158, 1170-71 (11th Cir. 2009) ("Absent a

constitutional violation, we need not explore whether [county's] policies regarding

crisis intervention training violated [the plaintiff's] constitutional rights.").[11]

Because this Court previously concluded that Counts One through Three fail to

---

[11] Plaintiffs fail to establish a claim under 42 U.S.C. § 1981 based on their own
cited precedent.  "To establish a claim under 42 U.S.C. § 1981, plaintiffs must
allege facts supporting the following elements: (1) plaintiffs are members of a
racial minority; (2) defendants' intent to discriminate on the basis of race; and (3)
discrimination concerning one of the statute's enumerated activities."  Brown v.
City of Oneonta, New York, 221 F.3d 329, 339 (2d Cir. 2000).  The Brown Court
held that "plaintiffs must meet the same pleading standard for their § 1981 claims
as for their § 1983 claims under the Equal Protection Clause."  Id.  Accordingly,
for the same reasons this Court has found Plaintiffs allegations insufficient to state
a claim under the Equal Protection Clause, the Court finds that Plaintiffs have
failed to allege a plausible constitutional violation under § 1981.

state a claim for a valid underlying constitutional injury, the <u>Monell</u> claim fails[12]

and is subject to dismissal.[13]

---

[12] Because the <u>Monell</u> claim fails, Clayton County must be dismissed as a Defendant.

[13] Even if the Amended Complaint successfully alleged an underlying constitutional violation, it fails to allege a custom or policy supporting <u>Monell</u> liability.  To show a custom or practice, Plaintiffs must allege facts that show a widespread pattern of conduct "so permanent and well settled as to constitute a 'custom or usage' with the force of law." <u>Brown v. City of Fort Lauderdale</u>, 923 F.2d 1474, 1481 (11th Cir. 1991) (citing <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988)).  As the custom or practice must be widespread and repeated, "random acts or isolated incidents are insufficient to establish a custom[.]" <u>Depew v. City of St. Mary's</u>, 787 F.2d 1496, 1499 (11th Cir. 1986).  In their Amended Complaint, other than Plaintiffs' own cases, they mention only two other incidents involving Lewis and Elie that occurred twenty months apart from one another.  Am. Compl. ¶¶ 93, 106.  <u>See</u> <u>Doe v. Sch. Bd. of Broward Cnty., Fla.</u>, 604 F.3d 1248, 1266-67 (11th Cir. 2010) (finding that two incidents, occurring approximately thirteen months apart, are insufficient to establish a custom). <u>Wakefield v. City of Pembroke Pines</u>, 269 F. App. 936, 940 (11th Cir. 2008) ("Two incidents, occurring approximately thirteen months apart, are insufficient to establish a custom."); <u>Pedraza v. Hall Cnty., Ga.</u>, No. 2:14-CV-00311-RWS, 2015 WL 1478930, at *3 (N.D. Ga. Mar. 31, 2015) (holding that the plaintiff failed to allege a custom or policy when it only alleged two prior incidents of similar misconduct); <u>Prieto v. Metropolitan Dade Cnty.</u>, 718 F. Supp. 934, 938 (S.D. Fla. 1989) (finding that evidence of four isolated incidents over a two year period was insufficient to establish custom).

**D.   There Are Additional Grounds For Dismissal.**

**1.   Official Capacity Claims Against the Officers (Roberts, Branham, Hooks, Griffin, Campbell, and Smith) Are Duplicative of Claims Against Clayton County.**

Defendants argue that the official capacity claims are duplicative because they are actually claims against Clayton County, which is a named party in the lawsuit. Defs.' Br. at 22-23. Plaintiffs do not respond to this argument, meaning it is unopposed. Kramer v. Gwinnett County, Ga., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.").

A suit against an official of the government in his or her official capacity is deemed to be a suit against the entity that employs the official. Ky. v. Graham, 473 U.S. 159, 165-66 (1985); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009) (citing Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)). Accordingly, Plaintiffs' claims against the individual Defendants in their official capacities is the functional equivalent of claims against Clayton County. See Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015) (stating that a suit against a public official in his official capacity is considered a suit against the government entity he represents). Therefore, the claims against the individual Defendants in their official capacities are subject to dismissal.

2.  **Defendants Branham, Hooks, Griffin, Campbell, and Smith Are Entitled to Qualified Immunity for Claims Against Them in Their Individual Capacities.**

For qualified immunity to apply, it must first be shown that the defendant has performed a discretionary function. Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009). It is undisputed that the functions performed by the individual Defendants in this matter were discretionary.

Because there are no constitutional violations plausibly alleged by Plaintiffs, qualified immunity applies to the officers. The Court need not reach the second prong of the qualified immunity analysis. Crenshaw v. Lister, 556 F.3d 1283, 1293 (11th Cir. 2009) ("[B]ecause there was no constitutional violation, we need not address whether the constitutional right at issue was clearly established."). Therefore, the individual Defendants are entitled to qualified immunity in this case.

Even if Plaintiffs had properly pleaded a Fourth Amendment violation in either Counts One or Two of the Amended Complaint, they would have failed to meet their burden to show that qualified immunity should not apply based upon clearly established precedent of the United States Supreme Court or the Eleventh Circuit. Plaintiffs contend that the conduct of the officers of the CCPD's Airport Interdiction Program violates Berry which, they assert, "clearly establishes the uniquely coercive nature of airport police stops." Pls. Resp. at 7. But Berry's

50

holding is limited to the general proposition that a seizure occurs if "in view of all

the circumstances surrounding the incident, a reasonable person would have

believed that he was not free to leave." Berry, 670 F.2d at 595 (quoting

Mendenhall, 446 U.S. at 554). Berry then lists several factors "that might be

relevant to a court's inquiry," but does not hold that one factor or a particular

combination of factors will necessarily tip the balance, because the determination

will be made based upon the facts of the individual case: "We now must apply to

the facts of this case the conclusions we have drawn from our examination of the

law governing airport stops." Id. at 603. As previously discussed, the facts in

Berry are not similar to this case because Plaintiffs were not suspected of drug

smuggling nor did they give false names and other false information to the officers.

Indeed, the Court has cited other precedents in which similar law enforcement

activities at airports were held not to result in a seizure.[14] Armstrong, 722 F.2d at

---

[14] Plaintiffs also allege that CCPD was provided "express notice" of the
unconstitutionality of their interdiction program in Noell v. Clayton Cnty., No.
1:15-CV-2404-AT, 2016 WL 11794207 (N.D. Ga. Sept. 21, 2016). Am. Compl.
¶ 113. Of course, for purposes of qualified immunity, clearly established federal
law must be provided only by the Supreme Court or the Eleventh Circuit.
Additionally, Noell is readily distinguishable. In Noell, after the passenger opened
her purse to obtain her identification, the officers saw over $20,000 in cash,
detained her, started searching her belongings on the jetway, and then took her
away from the airport to an undisclosed location. Id., 2016 WL 11794207 at *1.
The facts in this case are not remotely similar.

685 (concluding there was no seizure where the officer returned the passenger's ticket and identification after a minimal amount of time for questioning); Jensen, 689 F.2d at 1363-64 (same); Puglisi, 723 F.2d at 783-84 (determining that an encounter that took approximately four minutes was voluntary despite an officer leading a passenger to a different area, frisking him, and asking him questions about possessing drugs); Fla. v. Royer, 460 U.S. 491, 501 (1983) (distinguishing the request for a passenger's ticket and identification as a permissible encounter from one where the passenger is told he is suspected of transporting narcotics and escorted to a police room while the ticket and identification are retained).

### 3. Because There Are No Constitutional Violations, Smith Cannot Be Held Liable Under a Theory of Supervisory Liability.

Plaintiffs argue that Smith is liable under a supervisory liability theory based on the widespread pattern of constitutional violations committed by the officers under his supervision. Pls.' Resp. at 23-24. This claim fails because the Court has ruled that Plaintiffs have not sufficiently alleged facts to support any claims for constitutional violations. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999) (ruling that a supervisory liability claim cannot succeed without evidence of an underlying constitutional violation by one of the [supervisees]."").

**4.    Plaintiffs' Derivative Claims for Declaratory Relief and Punitive Damages Also Fail.**

Because the Court has dismissed all constitutional violations in Counts One through Four, no declaratory relief is possible.

> [T]he 'case or controversy' requirement of article III of the Constitution, provides that a declaratory judgment may only be issued in the case of an 'actual controversy.' That is, under the facts alleged, there must be a substantial continuing controversy between parties having adverse legal interests.

Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985). Additionally, the derivative claims for attorney's fees and for punitive damages fail as a matter of law. See Estes v. Tuscaloosa County, Ala., 696 F.2d 898, 901 (11th Cir. 1983) ("Section 1988 authorizes attorney's fees as part of a remedy for violations of civil rights statutes; it does not create an independent right of action."); Henry v. Jones, No. 4:11-CV-0064-HLM, 2011 WL 13177546, at *9 (N.D. Ga. Aug. 31, 2011) (finding that claims for punitive damages and fees fail as a matter of law following the dismissal of substantive claims).

IV.    **CONCLUSION**

Accordingly, it is hereby **ORDERED** that Defendants' Motion to Dismiss

[Doc. 25] is **GRANTED**.  The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 5th day of September, 2023.

MARK H. COHEN
United States District Judge